Filed 5/29/19; Certified for publication 6/25/19 (order attached)

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JENNI RIVERA ENTERPRISES, LLC, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> LATIN WORLD ENTERTAINMENT HOLDINGS, INC. et al., <br><br> Defendants and Appellants. | B279739 <br><br> (Los Angeles County Super. Ct. No. BC633764) |
| JENNI RIVERA ENTERPRISES, LLC, <br><br> Plaintiff and Respondent, <br><br> v. <br><br> UNIVISION COMMUNICATIONS INC. et al., <br><br> Defendants and Appellants. | B284358 <br><br> (Los Angeles County Super. Ct. No. BC649519) |

APPEALS from orders of the Superior Court of Los Angeles County, Michael J. Raphael, Judge. Affirmed in part, reversed in part, and remanded.

Lavely & Singer, Martin D. Singer and Andrew B. Brettler for Defendants and Appellants Latin World Entertainment Holdings, Inc., Luis Balaguer, and Dhana Media, Inc.

Stroock & Stroock & Lavan, James G. Sammataro and Crystal Y. Jonelis for Defendant and Appellant BTF Media, LLC.

Greenberg Glusker Fields Claman & Machtinger, Aaron J. Moss and Ricardo P. Cestero for Defendants and Appellants Univision Communications Inc. and Univision Networks & Studios, Inc.

Kendall Brill & Kelly, Bert H. Deixler, Robert E. Dugdale, Nicholas F. Daum and Laura W. Brill for Plaintiff and Respondent Jenni Rivera Enterprises, LLC.

_____

## INTRODUCTION

These appeals arise from a dispute concerning a television production based on the life of the Mexican-American celebrity Jenni Rivera, who died in a plane crash in December 2012. The entity that controls most of Rivera's assets, Jenni Rivera Enterprises, LLC (JRE), entered into a nondisclosure agreement with Rivera's former manager, Pete Salgado, that restricted his disclosure and use of certain personal information about Rivera and her family. Alleging Salgado breached that agreement by disclosing information to the producers and the broadcaster of a television series based on Rivera's life, JRE sued Salgado and the program's producers for breach of contract, interference with contract, and inducing breach of contract. JRE also sued the program's broadcaster for interference with contract and

2

inducing breach of contract. The defendants filed special motions to strike under Code of Civil Procedure section 425.16.[1] The trial court denied the motions, and the producers and broadcaster appeal those rulings.[2]

The producers argue JRE failed to demonstrate a probability of success on the merits of its causes of action. We conclude JRE satisfied its burden to demonstrate a prima facie case, with reasonable inferences from admissible evidence, that the producers had knowledge of the nondisclosure agreement before taking actions substantially certain to induce Salgado to breach the agreement. Therefore, we affirm the trial court's order denying the producers' special motion to strike.

The broadcaster makes similar arguments regarding JRE's case in chief, but also argues the First Amendment provides a complete defense because JRE's causes of action arise out of the broadcast of matters of public interest. Although First Amendment protection for newsgathering or broadcasting does not extend to defendants who commit a crime or an independent tort in gathering the information, it is undisputed the broadcaster did not know of the nondisclosure agreement at the time it contracted with the producers to broadcast the series, and JRE did not show the broadcaster engaged in sufficiently wrongful or unlawful conduct after it learned of the nondisclosure

---

[1] Undesignated statutory references are to the Code of Civil Procedure.

[2] Salgado joined the producers' special motion to strike, but dismissed his appeal from the trial court's order denying the motion to strike the causes of action against him for breach of contract and breach of fiduciary duty.

3

agreement to preclude First Amendment protection. Therefore, the First Amendment protected the broadcaster's use and broadcast of the information in the series, and we reverse the trial court's order denying the broadcaster's special motion to strike.

## FACTUAL AND PROCEDURAL BACKGROUND

A.    *Salgado Signs a Nondisclosure Agreement*

Rivera, born Dolores Janney Rivera, died at age 43 with five surviving children. After her death, Rivera's family and heirs created JRE to own and manage Rivera's intellectual property and publicity rights. Rivera's sister, Rosa Rivera Flores, asked Salgado and others in Rivera's "inner circle" to sign nondisclosure agreements intended to prevent them from capitalizing on Rivera's fame by disclosing sensitive and potentially embarrassing private information. According to Flores, Salgado signed the nondisclosure agreement in September 2013 in her presence, and she signed the agreement on behalf of JRE.

Among other things, the agreement provided: "Recipient [Salgado] shall hold in a fiduciary capacity for the benefit of JRE . . . all information, knowledge, and data relating to or concerned with their respective operations, business, financial affairs and personal affairs, including but not limited to personal affairs of [Rivera] . . . ; and Recipient shall not disclose or divulge any such information, knowledge, or data to any person, firm, or corporation . . . except as may otherwise be required in connection with the business and affairs of JRE provided that JRE or its designees provide written authorization prior to

4

release . . . ." The agreement also stated the Recipient may not "use for [himself] or others, disclose or divulge to other[s] including third parties, confidential information . . . includ[ing] without limitation any and all information and/or data related to the business and personal affairs of [Rivera]." The agreement stated its provisions remained "applicable after the termination of the agreement for any reason whatsoever."

B.    *The Producers Make a Television Series About Rivera*

In March 2016 a company owned by Salgado entered into a coproduction agreement with BTF Venture S.A. de C.V., the parent company of BTF Media, LLC (BTF), and with Dhana Media, Inc. to develop, produce, and deliver television programming (the Series) based on an unpublished manuscript by Salgado titled "Her Real Name was Dolores" (the Coproducers Agreement).[3] Each of the signatories to the Coproducers Agreement represented and warranted that the Series, its development, production, and delivery would not contain "anything or be handled in such a way as to cause or constitute a

---

[3]    Latin World Entertainment Holdings, Inc. and its Chief Executive Officer, Luis Balaguer, were not parties to the Coproducers Agreement, but JRE alleged that Balaguer was an executive producer of and the "driving force behind" the production and development of the Series and that Balaguer's declaration in support of the special motion to strike concedes he and Latin World Entertainment Holdings were involved in "developing" the Series. We refer collectively to BTF, Dhana Media, Latin World Entertainment Holdings, and Balaguer as the "Producers."

5

violation of any third party's rights." The signatories also represented and warranted they had not entered into any agreement that was inconsistent with the provisions of the Coproducers Agreement.[4]

In May 2016 Flores learned from press releases that Salgado was working with Univision Communications Inc. and Univision Networks & Studios, Inc. (collectively, Univision) on a television series called "Su Verdadero Nombre Era Dolores" ("Her Real Name Was Dolores"). One of the press releases stated the Series "reveals the true woman behind the music and the headlines as told by her former manager, a man she publicly referred to as her fifth brother, Pete Salgado. . . . [F]ans will get Pete's previously untold perspective on the woman he knew. . . . Salgado . . . promises to reveal the uncensored and fascinating

---

[4] The record includes a heavily redacted version of the Coproducers Agreement. We deny JRE's motion for judicial notice of an unredacted version of this agreement that was not before the trial court. (*Mechling v. Asbestos Defendants* (2018) 29 Cal.App.5th 1241, 1244, fn. 1; see *Haworth v. Superior Court* (2010) 50 Cal.4th 372, 379, fn. 2 ["'[r]eviewing courts generally do not take judicial notice of evidence not presented to the trial court' absent exceptional circumstances"].) We also deny JRE's motion for judicial notice of other documents filed in the Producers action after the trial court ruled on the Producers' special motion to strike for the same reason and because those documents are not relevant to resolving the Producers' appeal. To resolve these appeals, "we rely solely upon the evidence that was presented to and considered by the trial court." (*Haworth*, at p. 379, fn. 2.)

life story of the real woman behind the music, glamour and fame."

Also in May 2016 BTF signed a term sheet with Univision to develop, produce, and broadcast the Series. The term sheet stated the Series would be "based on a currently-unpublished book (Book) written by [Salgado] based on the life of singer [Rivera]." The term sheet required BTF to deliver 26 episodes for the Series in four installments from January 9, 2017 to January 30, 2017 and anticipated Univision would begin broadcasting the Series no later than January 16, 2017. The term sheet required Univision to pay BTF in installments as well, beginning 10 days after execution of the term sheet and ending upon final delivery of all episodes. BTF agreed in the term sheet to report to Univision at least semimonthly on various aspects of the production, and BTF represented and warranted that, among other things, each episode of the Series would not infringe the contractual rights of any third party.[5]

On September 8, 2016 Univision announced it had commenced production of the Series. A press release stated the Series would be "based on the book written by executive producer Pete Salgado, who worked closely with [Rivera] in her last years

---

[5] An affidavit Salgado signed August 3, 2016 also refers to a term sheet between Salgado, his company Tuyo Media Group, Inc., and BTF concerning the Series. That term sheet included an unfortunately titled "accompanying letter of inducement." The record does not include the term sheet or the letter of inducement.

of life and promises to reveal many secrets."[6]  By late December 2016 production was complete, and Univision planned to begin broadcasting the Series in January 2017.

C.    *JRE Sends Cease and Desist Letters and Files Two Lawsuits*

Shortly after discovering Salgado was involved in the Series, JRE sent Salgado and the Producers a cease and desist letter dated June 3, 2016.  The letter included a copy of the nondisclosure agreement JRE claimed Salgado signed and asserted the agreement prevented Salgado from disclosing information regarding Rivera's business, financial, and personal affairs.  The letter accused Salgado of breaching the agreement by making disclosures to Univision and other third parties, asked Salgado to inform the Producers and Univision they were not authorized to create a television program based on confidential information about Rivera supplied by Salgado, and demanded Salgado refrain from further using information he agreed not to disclose.

Salgado responded later that same day by claiming the nondisclosure agreement attached to the cease and desist letter was "a poorly executed forgery."  Through his attorney, Salgado stated that he did not sign the nondisclosure agreement and that someone must have "cut out or copied his signature from another

---

[6]    The September 8, 2016 press release included in the record is in Spanish and states:  "Esta producción estará basada en el libro que escribió el productor ejecutivo Pete Salgado, quien trabajó muy de cerca con la cantante en sus últimos años de vida y promete revelar muchos secretos."

document and pasted it onto the signature block." The Producers did not respond to the cease and desist letter. In response to Salgado's letter, JRE stated through its attorneys, in a letter also delivered to representatives of the Producers, that JRE had the original nondisclosure agreement with Salgado's signature on it and that a witness could identify the time and place Salgado signed the agreement.

On September 12, 2016 JRE filed a complaint against Salgado and the Producers alleging breach of contract and breach of fiduciary duty against Salgado and interference with contract and inducing breach of contract against the Producers.[7] JRE's allegations in the complaint acknowledged Salgado's claim that the nondisclosure agreement was a forgery and stated that JRE had hired a forensic document examiner who opined the agreement "was unquestionably signed by Salgado." "Nonetheless," JRE alleged, "Salgado continues to engage in his illicit conduct to this very day by continuing to disclose protected information about Ms. Rivera and her family." (Emphasis omitted.) JRE alleged the Producers also "continue[d] to intentionally induce Salgado's breaches and interfere with JRE's agreement with Salgado, to this very day, through their production and development of the Univision series—which includes the ongoing disclosure by Salgado of Ms. Rivera's confidential information."

---

[7] The complaint alleged a fifth cause of action against both Salgado and the Producers for violation of Business and Professions Code section 17200. The trial court granted the special motion to strike that cause of action, and JRE does not challenge this ruling.

9

JRE alleged that the past and future wrongful conduct by Salgado and the Producers "devalued the information and inhibited JRE's ability to utilize some or all of the information about Ms. Rivera and her story for the benefit of JRE and, most importantly, Ms. Rivera's children. For example, the wrongful conduct has devalued opportunities for an authorized book about Ms. Rivera or an authorized television show about Ms. Rivera." JRE sought damages, equitable relief, and punitive damages in connection with the cause of action for interference with contract.

Also on September 12, 2016 JRE sent Univision a copy of the complaint against Salgado and the Producers and the attached nondisclosure agreement. Univision responded on September 23, 2016 and reiterated Salgado's claim the nondisclosure agreement was a forgery. On December 28, 2016 JRE sent Univision a copy of a December 21, 2016 restraining order the trial court issued against Salgado. The restraining order enjoined Salgado from violating the terms of the nondisclosure agreement, including by disclosing information protected by the agreement or using such information for himself or others. In its letter accompanying the restraining order, JRE asserted Univision "has and continues to interfere with the [nondisclosure agreement] and induce its breach. As the [trial court] has made clear, any reliance on Salgado's unfounded assertions about his signature's authenticity is unreasonable given the strong evidence of the validity of the [nondisclosure agreement]."

The Series premiered on Univision on January 15, 2017, and Rivera's sister confirmed her belief the Series included information known only to Rivera's family, Salgado, and a small number of individuals who were not involved with the Series. On

February 6, 2017 JRE filed a complaint against Univision for interference with contract and inducing breach of contract. The complaint alleged Univision knew of Salgado's nondisclosure agreement no later than September 12, 2016, but continued to induce Salgado to "disclose secrets covered by the [nondisclosure agreement] by providing him with a financial incentive to disclose such secrets, a platform to disclose such secrets, and the prestige of serving as an executive producer on a television show broadcast on Univision in which he could air such secrets." JRE alleged that, as a result of Univision's alleged "actual and ongoing breach or disruption of the contractual relationship between JRE and Salgado," JRE was entitled to actual damages, restitution, disgorgement, and punitive damages.

D. *The Producers and Univision File Special Motions To Strike*

The Producers and Univision filed special motions to strike the complaints under section 425.16. In the first step of the section 425.16 analysis, they argued the complaints arose from protected activity because developing, producing, and broadcasting a television series are acts in furtherance of the right to free speech. In the second step, the Producers argued JRE could not show a probability of prevailing on the merits because the Producers did not have knowledge of the nondisclosure agreement "before the development of the Series" or before BTF entered into the term sheet with Univision. The Producers argued they "could not have **intended** to induce a breach of a then-unknown contract." The Producers argued that, once they learned of the existence of the nondisclosure agreement, they did not know whether it was authentic or

11

enforceable.  They claimed that, after receiving the June 3, 2016 cease and desist letter, "Salgado signed a notarized affidavit under penalty of perjury declaring that: (1) he never signed the NDA [nondisclosure agreement]; (2) there is no agreement restricting him from discussing his personal and professional dealings with Ms. Rivera; and (3) the signature on the NDA provided by [JRE's] counsel to [the Producers] did not belong to him."  Thus, according to the Producers, even if JRE could ultimately prove the nondisclosure agreement was legitimate, JRE could not show the Producers intended to induce a breach of contract because the Producers "subjectively (and reasonably) believed Salgado's representations that no valid contract existed." The Producers also argued their conduct could not have caused Salgado to breach the nondisclosure agreement because the Producers' allegedly wrongful conduct occurred after Salgado had allegedly breached the agreement.

Univision argued JRE could not show a probability of prevailing on the merits because JRE had not shown the Series included confidential information provided by Salgado, Univision did not know about the nondisclosure agreement "at the time [Univision] negotiated and entered into the license agreement in May 2016 with BTF," there was no evidence Univision interfered with Salgado's nondisclosure agreement, and California's Uniform Trade Secrets Act (Civ. Code, § 3426.1) (UTSA) and the First Amendment barred JRE's tort claims against Univision. Univision argued the First Amendment provides blanket protection for the publication or broadcast of truthful information about a matter of general public interest like the Series.

In response to both motions JRE did not contest the defendants' showing that JRE's causes of action arose from

12

protected conduct under the first step of the section 425.16 analysis. JRE argued, however, that section 425.16 requires only a prima facie showing of "minimal merit" and that JRE had produced sufficient admissible evidence to satisfy that standard. JRE argued that, even if the Producers and Univision did not know about the nondisclosure agreement at the time they entered into contracts relating to the production of the Series, they had notice of the agreement no later than June 3, 2016 and September 12, 2016, respectively, and they induced Salgado to breach the agreement and interfered with it throughout the production. For example, JRE argued Salgado continued to breach the nondisclosure agreement after the Producers and Univision had knowledge of the agreement because the Producers paid Salgado for his continued involvement in making the Series, Univision continued to provide financing for producing the Series, and both the Producers and Univision agreed to credit Salgado as a co-producer of the Series.

In support of its argument that Salgado continued to use and disclose confidential information to the Producers and Univision after they had knowledge of the nondisclosure agreement, JRE pointed to Salgado's admission in an affidavit that his manuscript was not complete as late as August 2016, the Producers' concession that they "expended considerable time and financial resources developing and producing the Series" after May 2016, and the BTF term sheet with Univision, which provided for ongoing payments to BTF (and indirectly to Salgado) throughout the production. Based on this and other evidence, JRE argued the trial court could reasonably infer that Salgado used and disclosed confidential information in connection with the production after the Producers and Univision had knowledge

13

of the nondisclosure agreement.  JRE responded to Univision's First Amendment and UTSA defenses by asserting that the First Amendment did not protect Univision from liability for "infringing upon [JRE's] contractually-granted rights" and that the disclosures by Salgado were not "trade secrets."

Following separate hearings on the special motions to strike, the trial court denied the motions to strike JRE's causes of action for interference with contract and inducing breach of contract.  The Producers and Univision timely appealed.

## DISCUSSION

A.    *Section 425.16*

"A strategic lawsuit against public participation . . . is one which 'seeks to chill or punish a party's exercise of constitutional rights to free speech and to petition the government for redress of grievances.'" (*Contreras v. Dowling* (2016) 5 Cal.App.5th 394, 404; see *Shahbazian v. City of Rancho Palos Verdes* (2017) 17 Cal.App.5th 823, 829.)  "Section 425.16 . . . provides a procedural remedy to dispose of lawsuits that are brought to chill the valid exercise of constitutional rights."[8] (*Contreras*, at p. 404; see *Shahbazian*, at p. 830.)  "The statute 'authorizes a defendant to

_____

[8]    Section 425.16, subdivision (b)(1), provides:  "A cause of action against a person arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue shall be subject to a special motion to strike, unless the court determines that the plaintiff has established that there is a probability that the plaintiff will prevail on the claim."

14

file a special motion to strike any cause of action arising from an act in furtherance of the defendant's constitutional right of petition or free speech in connection with a public issue.'" (*Contreras*, at p. 404; see *Barry v. State Bar of California* (2017) 2 Cal.5th 318, 321 (*Barry*).)

Section 425.16 "does not insulate defendants from *any* liability for claims arising from the protected rights of petition or speech.  It only provides a procedure for weeding out, at an early stage, *meritless* claims arising from protected activity." (*Baral v. Schnitt* (2016) 1 Cal.5th 376, 384 (*Baral*); see *Zhang v. Jenevein* (2019) 31 Cal.App.5th 585, 592.)  Resolution of a special motion to strike "involves two steps.  First, the defendant must establish that the challenged claim arises from activity protected by section 425.16.  [Citation.]  If the defendant makes the required showing, the burden shifts to the plaintiff to demonstrate the merit of the claim by establishing a probability of success." (*Baral*, at p. 384; accord, *Park v. Board of Trustees of California State University* (2017) 2 Cal.5th 1057, 1061.)

The second step requires a "'summary-judgment-like'" analysis. (*Baral*, *supra*, 1 Cal.5th at p. 384; see *Taus v. Loftus* (2007) 40 Cal.4th 683, 714.)  "The court does not weigh evidence or resolve conflicting factual claims.  Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment." (*Baral*, at pp. 384-385; see *Barry*, *supra*, 2 Cal.5th at p. 321.)  "[A] trial court considers 'the pleadings, and supporting and opposing affidavits stating the facts upon which the liability or defense is based' in evaluating the plaintiff's probability of success." (*Barry*, at p. 321; see § 425.16, subd. (b)(2).)  Evidence supporting a reasonable inference may

establish a prima facie case. (See *Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 822 (*Oasis West Realty*) ["the proper inquiry in the context of [a special motion to strike] 'is whether the plaintiff proffers sufficient evidence for such an inference'"]; *Fremont Reorganizing Corp. v. Faigin* (2011) 198 Cal.App.4th 1153, 1175 [plaintiff established a prima facie case of breach of confidence and breach of fiduciary duty by showing a reasonable inference the defendant improperly used or disclosed confidential information].)

The court accepts the plaintiff's evidence as true and evaluates the defendant's showing "only to determine if it defeats the plaintiff's claim as a matter of law." (*Baral*, *supra*, 1 Cal.5th at p. 385; see *Barry*, *supra*, 2 Cal.5th at p. 321.) "'In making this assessment, the court . . . must also examine whether there are any constitutional or nonconstitutional defenses to the pleaded claims and, if so, whether there is evidence to negate any such defenses.'" (*Dean v. Friends of Pine Meadow* (2018) 21 Cal.App.5th 91, 107; see *McGarry v. University of San Diego* (2007) 154 Cal.App.4th 97, 108.) "'"[C]laims with the requisite minimal merit may proceed."'" (*Sweetwater Union High School District v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940; accord, *Park v. Board of Trustees of California State University*, *supra*, 2 Cal.5th at p. 1061; see *Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702 ["[t]he 'burden of establishing a probability of prevailing is not high'"]; *Whitehall v. County of San Bernardino* (2017) 17 Cal.App.5th 352, 363 [same].) Indeed, "'to satisfy due process, the burden placed on the plaintiff must be compatible with the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery.'" (*Hardin v. PDX, Inc.* (2014) 227 Cal.App.4th 159, 166; see *Integrated*

*Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 530 ["[w]e are inclined to allow the plaintiff in a [special motion to strike] a certain degree of leeway in establishing a probability of prevailing on its claims due to 'the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery'"].)

We review de novo an order granting or denying a special motion to strike under section 425.16. (*Park v. Board of Trustees of California State University*, *supra*, 2 Cal.5th at p. 1067; *Oasis West Realty*, *supra*, 51 Cal.4th at pp. 819-820.) "If the trial court's decision denying [a special motion to strike] is correct on any theory applicable to the case, we may affirm the order regardless of the correctness of the grounds on which the trial court reached its conclusion." (*Issa v. Applegate*, *supra*, 31 Cal.App.5th at p. 701; see *Reed v. Gallagher* (2016) 248 Cal.App.4th 841, 853.)

> B.  *JRE Made a Prima Facie Showing Sufficient To Sustain a Favorable Judgment on Its Causes of Action Against the Producers for Interference with Contract and Inducing Breach of Contract*

"The elements of a cause of action for intentional interference with contractual relations are '(1) the existence of a valid contract between the plaintiff and a third party; (2) the defendant's knowledge of that contract; (3) the defendant's intentional acts designed to induce a breach or disruption of the contractual relationship; (4) actual breach or disruption of the contractual relationship; and (5) resulting damage.'" (*Redfearn v. Trader Joe's Co.* (2018) 20 Cal.App.5th 989, 997; see *Popescu v. Apple Inc.* (2016) 1 Cal.App.5th 39, 51 (*Popescu*).)  The

17

defendant's conduct need not be wrongful apart from the interference with the contract. (*Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 55; *Popescu*, at p. 51.) "Furthermore, a plaintiff need not establish that the primary purpose of the defendant's actions was to disrupt the contract. The tort is shown even where "'the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his [or her] action.'"" (*Popescu*, at p. 51; see Rest.2d Torts, § 766, com. j, p. 12.)

The tort of inducing breach of contract requires proof of a breach, whereas the tort of interference with contractual relations requires only proof of interference. (See *Pacific Gas & Electric Co. v. Bear Stearns & Co.* (1990) 50 Cal.3d 1118, 1129 ["[p]laintiff need not allege an actual or inevitable breach of contract in order to state a claim for disruption of contractual relations"]; *Heritage Provider Network, Inc. v. Superior Court* (2008) 158 Cal.App.4th 1146, 1154 [same].) Because JRE alleged the same conduct caused a breach and a disruption of the nondisclosure agreement, we address together whether JRE made the required showing of minimal merit on both causes of action. (See *Sweetwater Union High School District v. Gilbane Building Co.*, *supra*, 6 Cal.5th at p. 940 [only a ""'minimal" showing [is] necessary to overcome a [special motion to strike]'"].)

### 1. *The Existence of a Valid Contract*

JRE alleged the nondisclosure agreement between JRE and Salgado precluded Salgado from disclosing or using certain confidential information about Rivera. The Producers did not argue in their special motion to strike that JRE could not make a

18

prima facie factual showing on the existence of this contract. The trial court found JRE made a prima facie showing the agreement was valid and enforceable, and the Producers do not challenge this aspect of the court's order.

2.    *Knowledge of the Nondisclosure Agreement*

"To recover damages for inducing a breach of contract, the plaintiff need not establish that the defendant had full knowledge of the contract's terms. Comment i to Restatement of Second of Torts, section 766, . . . states: 'To be subject to liability [for inducing a breach of contract], the actor must have knowledge of the contract with which he is interfering and of the fact that he is interfering with the performance of the contract.'" (*Little v. Amber Hotel Co.* (2011) 202 Cal.App.4th 280, 302; see *I-CA Enterprises, Inc. v. Palram Americas, Inc.* (2015) 235 Cal.App.4th 257, 290 [knowledge of a contractual relationship is sufficient to show knowledge for the tort of inducing breach of contract].)

a.    *JRE Made a Sufficient Showing the Producers Knew of the Agreement Before They Allegedly Interfered with and Induced Salgado To Breach It*

JRE alleged and provided evidence the Producers knew of the nondisclosure agreement no later than June 3, 2016, when JRE sent the cease and desist letter attaching the agreement. The Producers concede they received the letter at that time. They argue, however, that JRE failed to present evidence showing they knew of the nondisclosure agreement "when they began developing the Series" and that any subsequently acquired knowledge is not relevant to JRE's causes of action. JRE's causes

19

of action, however, are not limited to conduct that occurred when production of the Series began. Under the terms of the nondisclosure agreement, Salgado had a continuing obligation not to disclose or use confidential information about Rivera. In addition, JRE submitted evidence the Producers knew of the nondisclosure agreement and its likely authenticity before or very soon after production of the Series began in September 2016.

The Producers suggest they cannot be liable for inducing any breach of the nondisclosure agreement that occurred after the first time JRE claims Salgado breached the agreement, which may have occurred as early as February 2016, when Salgado met with the Producers and Univision. But successive causes of action for breach of contract may arise from a single contract with continuing obligations. (See § 1047 ["[s]uccessive actions may be maintained upon the same contract or transaction, whenever, after the former action, a new cause of action arises therefrom"]; *Yates v. Kuhl* (1955) 130 Cal.App.2d 536, 540 ["[s]uccessive causes of action based on the same contract or transaction are specifically recognized by section 1047"]; see also *Aryeh v. Canon Business Solutions, Inc.* (2013) 55 Cal.4th 1185, 1199 ["'[w]hen an obligation or liability arises on a recurring basis, a cause of action accrues each time a wrongful act occurs, triggering a new limitations period'"]; *Hogar Dulce Hogar v. Community Development Commission* (2003) 110 Cal.App.4th 1288, 1295 [same].)[9] "[C]ontracts [that] require continuing (or continuous)

---

[9] Most of the cases addressing whether successive, partial breaches of a contract may support a cause of action for inducing breach of contract or interference with a contract arise in the context of a dispositive motion based on the statute of limitations.

20

performance for some specified period of time, a period that may be definite or indefinite when the contract is made[,] . . . are capable of a series of 'partial' breaches, as well as of a single total breach by repudiation or by such a material failure of performance when due as to go 'to the essence' and to frustrate substantially the purpose for which the contract was agreed to by the injured party.  For each 'partial' breach a separate action is maintainable."  (10 Corbin on Contracts (2018) § 53.14; see 31 Williston on Contracts (4th ed. 2010) § 79:23, p. 379 [each breach of a continuing or ongoing obligation "gives rise to a separate cause of action"].)

The nondisclosure agreement imposed a continuing obligation on Salgado not to disclose or use confidential information about Rivera without JRE's consent.  (See *Bakst v. Community Memorial Health System, Inc.* (C.D.Cal., Mar. 7, 2011, Case No. CV 09-08241 MMM-FFMx) 2011 WL 13214315, at p. 10 [applying California law and concluding that a settlement agreement's nondisparagement clause created an "ongoing security" that "did not end with [the] first alleged breach"]; *Kwan v. Schlein* (S.D.N.Y. 2006) 441 F.Supp.2d 491, 501 [complaint stated a claim for breach of contract where the plaintiff alleged "partial and ongoing" breaches of the promises to give her co-author credit and royalties in perpetuity].)  JRE

---

In such cases courts determine whether a cause of action alleging a breach or wrongful conduct outside the limitations period caused the statute of limitations to run for conduct occurring within the limitations period or whether there is a separate accrual date for each breach.  (See generally 6 Callmann on Unfair Competition, Trademarks & Monopolies (4th ed. 2004) § 23:32.)

claims Salgado breached the nondisclosure agreement each time he disclosed to the Producers new information covered by the agreement or used such information in a new way.

The Producers argue that California law does not recognize a cause of action for interference with or inducing a breach of contract based on a theory of partial, continual, or ongoing breaches of contract and that any such theory does not apply to the facts of this case. Indeed, none of the parties has identified a California case endorsing a cause of action for interference with or inducing a breach of a contract that imposed a continuing obligation, and several federal authorities applying California law have acknowledged the absence of authority on this issue. (See, e.g., *Wolf v. Travolta* (C.D.Cal. 2016) 167 F.Supp.3d 1077, 1105; *DC Comics v. Pacific Pictures Corp.* (C.D.Cal. 2013) 938 F.Supp.2d 941, 950.)

But in *Boon Rawd Trading Intern. Co., Ltd. v. Paleewong Trading Co., Inc.* (N.D.Cal. 2010) 688 F.Supp.2d 940 the federal district court, applying California law, allowed a claim for intentional interference with prospective economic advantage to proceed based on the allegation the defendant engaged in "a scheme and pattern of tortious conduct" that purportedly began in 2003 with the formation of a beer distributor that competed with the plaintiff and continued through the commencement of the action seven years later. (*Id.* at p. 952.) The plaintiff in *Boon Rawd* alleged, among other things, the defendant misappropriated the plaintiff's trade secrets in a "tactical scheme" to strip the plaintiff of its exclusive importation rights for a particular beer. (*Id.* at p. 944.) The court held that "discrete" wrongful acts underlying the cause of action for interference with prospective economic advantage, if proven,

22

satisfied each element of that tort.  (*Id.* at p. 952.)  Other federal courts applying state law have similarly recognized a cause of action for interference with a contract based on discrete, partial breaches of the contract underlying the claim.  (See *Hi-Lite Products Co. v. American Home Products Corp.* (7th Cir. 1993) 11 F.3d 1402, 1410 [claims for tortious interference with contract and prospective economic advantage based on partial breaches of an exclusive distribution agreement]; *Dickinson v. University of North Carolina* (M.D.N.C. 2015) 91 F.Supp.3d 755, 767 [claim for tortious interference with contract based on partial breaches of an education contract]; *Moser v. Triarc Co., Inc.* (S.D.Cal., Mar. 29, 2007, No. 05cv1742-LAB (WMc)) 2007 WL 1111245, at p. 2 [defendants allegedly induced a breach of contract each time they published defamatory statements in a different form].)

The Producers cite numerous cases from California and other states in support of their argument that they cannot be liable for inducing a breach of or interfering with the nondisclosure agreement because they did not have knowledge of the agreement at the time production of the Series began.  None of the cases they cite, however, stands for the proposition that JRE cannot state a cause of action based on Salgado's continuing obligations under the agreement and his breaches of discrete obligations at different times.  The case on which the Producers primarily rely, *Dryden v. Tri-Valley Growers* (1977) 65 Cal.App.3d 990 (*Dryden*), is distinguishable.  In *Dryden* the plaintiffs alleged the new owner of an olive oil processing plant interfered with the plaintiffs' rights to purchase certain waste products from olive oil production under an agreement with the original owners.  (*Id.* at p. 993.)  Before the new owner purchased the plant, however, the original owners advised the plaintiffs that

they (the original owners) intended to rescind and cancel the contract. (*Ibid.*) Moreover, in *Dryden* it was undisputed the new owner did not know about the plaintiffs' contract with the original owners until the day after the new owner executed the purchase agreement for the plant. (*Id.* at p. 995.) In contrast, there is no evidence Salgado informed JRE he did not intend to perform his obligations under the nondisclosure agreement (indeed, he denied its existence).[10]

The other cases cited by the Producers did not involve allegations of partial breaches of a contract that imposed continuing obligations. (See *Effs v. Sony Pictures Home Entertainment, Inc.* (Fla.Dist.Ct.App. 2016) 197 So.3d 1243, 1244-1245 [allegedly wrongful conduct occurred when partners entered

---

[10] *Hill v. Progress Co.* (1947) 79 Cal.App.2d 771 (*Hill*), cited by the Producers, is also distinguishable. In that case the plaintiff alleged a truck driver caused a company to breach the plaintiff's exclusive hauling contract with the company. The court held the plaintiff failed to show causation because the truck driver did not know about the plaintiff's contract when the company hired the truck driver, thus breaching the plaintiff's exclusivity contract. (*Id.* at p. 780.) The plaintiff argued the truck driver should be liable for damages caused after the plaintiff told the truck driver about his exclusive contract, but the court disagreed and held the breach "took place with the hiring of" the truck driver. (*Ibid.*) As the trial court here recognized, the breach of the exclusive hauling contract in *Hill* occurred at the time the company hired the truck driver, thus rendering the plaintiff's contract nonexclusive. In contrast, JRE alleges Salgado breached the nondisclosure agreement numerous times and in numerous ways, some of which occurred after the Producers had knowledge of the agreement.

into a distribution agreement with the defendant without the plaintiff's knowledge]; *D'Arcy & Assoc. v. K.P.M.G. Peat Marwick* (Mo.Ct.App. 2004) 129 S.W.3d 25, 30 [allegedly wrongful conduct occurred when the plaintiff's client hired the defendant as client's new accountant];[11] *Blazer Foods, Inc. v. Restaurant Properties, Inc.* (2003) 259 Mich.App. 241, 243 [allegedly wrongful conduct occurred when the defendants turned the franchisee's restaurants into a "laboratory experiment," not when the plaintiff suffered economic losses]; *Electronic Bankcard Systems, Inc. v. Retriever Industries, Inc.* (Tex.App., Jan. 30, 2003, No. 01-01-00240-CV) 2003 WL 204717, at p. 7 [declining to apply the continuing tort doctrine to the plaintiffs' claim for tortious interference with a business relationship where there was no "ongoing wrong"].)  These cases merely acknowledge the unremarkable propositions that the tort of interference with a contractual relationship is complete upon the simultaneous occurrence of each element of the tort and that individual elements of the tort occurring later in time do not relate back to conduct that completed the tort outside the period of limitations. (See, e.g., *Blazer Foods, Inc. v. Restaurant Properties, Inc.*, at p. 256.)  But that does not mean a plaintiff cannot maintain a cause of action for interference with contractual relations or inducing breach of contract for separate, completed torts with discrete accrual dates.  (See 6 Callmann on Unfair Competition, *supra*, at

---

[11]    The court in *D'Arcy* stated:  "The wrong, therefore, was not continuing.  The damage or injury that had been inflicted may have continued to develop during successive tax periods, but it did not result from repeating wrongful conduct." (*D'Arcy, supra*, 129 S.W.3d at p. 30.)

§ 23:32 ["[s]ome cases say that interference with contractual relations is not a continuing tort," but "that may depend on whether the underlying conduct which creates the interference is of a continuing nature or not," fns. omitted].)

b.    *The Producers' Remaining Arguments Do Not Defeat JRE's Prima Facie Showing of Knowledge*

The Producers argue that, even if knowledge of the nondisclosure agreement acquired subsequent to the Coproducers Agreement is relevant, JRE's cease and desist letter did not give the Producers sufficient knowledge of the agreement.  The Producers contend they reasonably doubted the authenticity and enforceability of the agreement because Salgado declared under penalty of perjury that he never signed the agreement, that there was no agreement restricting him from discussing his personal experiences with Rivera, and that his signature on the agreement was a forgery.

The Producers' argument, however, does not demonstrate, as a matter of law, that they did not have the requisite knowledge of the nondisclosure agreement to avoid liability for inducing its breach or interfering with it.  Instead, based on reasonable inferences from the evidence submitted by JRE, the trier of fact could conclude the Producers had knowledge of the nondisclosure agreement before they induced Salgado to breach it or otherwise interfered with it.  (See *Oasis West Realty*, *supra*, 51 Cal.4th at p. 822 [reasonable inference may constitute a prima facie showing to defeat a special motion to strike]; *Fremont Reorganizing Corp. v. Faigin*, *supra*, 198 Cal.App.4th at p. 1175 [same].)  This evidence included the cease and desist letter and

26

related correspondence, Flores's declaration that she witnessed Salgado sign the agreement, the forensic document examiner's opinion that Salgado "unquestionably signed" the agreement, and Salgado's various and inconsistent attempts to explain away the agreement.[12]  At most, the Producers' argument created an issue for the trier of fact regarding the Producers' knowledge of the nondisclosure agreement; it did not defeat JRE's showing of minimal merit.

The Producers also argue they cannot be liable for inducing the breach of or interfering with the nondisclosure agreement because such liability would require them to rescind the Coproducers Agreement.  The Producers, however, do not identify any provision of that agreement that necessarily conflicted with the nondisclosure agreement (and the Producers elected to provide only a redacted version of the Coproducers Agreement). Nothing in the redacted agreement precluded the Producers from producing a television program about Rivera that did not include confidential information sourced from Salgado or rely on Salgado's use of such information.

3.  *Intentional Acts Designed To Induce a Breach of or Disrupt the Contract*

The third element of the tort of intentional interference with contract requires the plaintiff to plead and prove the

---

[12]  On October 20, 2016 Salgado conceded the signature on the nondisclosure agreement was his.  In support of his special motion to strike, Salgado argued instead that the fourth page of the agreement, which included his signature, was not attached to the rest of the document at the time he signed it.

"""defendant's intentional acts [were] designed to induce a breach or disruption of the contractual relationship."""" (*Korea Supply Co. v. Lockheed Martin Corp.* (2003) 29 Cal.4th 1134, 1155; see *Quelimane Co. v. Stewart Title Guaranty Co.*, *supra*, 19 Cal.4th at p. 55.) Specific intent is not required. (*Korea Supply*, at p. 1155.) Instead, the plaintiff need only show "interference is certain or substantially certain to occur as a result of [the defendant's] action." (*Id.* at pp. 1155-1156; see *Popescu*, *supra*, 1 Cal.App.5th at p. 51 [intentional interference with contractual relations occurs where """"the actor does not act for the purpose of interfering with the contract or desire it but knows that the interference is certain or substantially certain to occur as a result of his [or her] action""""].)

JRE contends the following intentional acts by the Producers made interference with the nondisclosure agreement substantially certain to occur: (1) making payments to Salgado throughout the production of the Series; (2) giving Salgado credit as an executive producer of the Series; and (3) marketing the Series to promote Salgado's role in its production and his forthcoming book. The Producers concede they made payments to Salgado "on an ongoing basis throughout the production of the Series" and gave Salgado credit as an executive producer of the Series. Combined with press releases mentioning Salgado's forthcoming book and a web of interrelated commercial agreements concerning the Series between Salgado, his company, the Producers, and Univision, this evidence supports a

28

reasonable inference that the Producers induced Salgado to participate in the production of the Series.[13]

JRE further contends the Producers must have known these acts would result in Salgado breaching the nondisclosure agreement because, no later than September 2016, the Producers had knowledge of the nondisclosure agreement, its restrictions on Salgado, and its likely authenticity; the Series was conceived and marketed after September 2016 as "a tell-all based around Salgado's unique access to secrets about [Rivera]"; and the Producers created the Series between September and December 2016. We agree with the trial court's conclusion that this evidence satisfied JRE's burden to show the Producers knew their acts were substantially certain to interfere with the nondisclosure agreement. (*Popescu*, *supra*, 1 Cal.App.5th at p. 51.)

The Producers argued in the trial court and argue on appeal that, even if they made payments to Salgado throughout the production of the Series or gave him an executive producer credit when the Series aired, they did so "pursuant to contracts

---

[13]    JRE also alleges the Producers agreed to give or share with Salgado certain intellectual property rights in the Series and allowed Salgado to use Rivera's confidential information without taking measures to ensure compliance with the nondisclosure agreement. JRE presented no admissible evidence of an agreement between the Producers and Salgado regarding intellectual property rights and cites no authority for the proposition that failing to stop someone from breaching a nondisclosure agreement constitutes an intentional act in support of a cause of action for intentional interference with that agreement.

entered into **before** [the Producers] learned about the alleged NDA." The Producers cite *Imperial Ice Co. v. Rossier* (1941) 18 Cal.2d 33 (*Imperial Ice*) for the proposition that performance of a contract that results in one party breaching a contract with a third party, without more, does not prove intentional interference with the third party's contract. (See *id.* at p. 39.) But here, as in *Imperial Ice*, JRE alleged and submitted evidence of more. JRE alleged the Producers used their contractual relationship with Salgado after they had knowledge of the nondisclosure agreement to induce Salgado to breach that agreement, which deprived JRE of the value of the information protected by the agreement and damaged JRE's ability to exploit it. JRE also submitted a press release stating, "Just days after Jenni Rivera's estate announced plans are under way to produce her biopic, Univision revealed it will produce a TV series based on the late singer's life . . . ." Based on evidence the Producers knew about Salgado's relationship with JRE, the nondisclosure agreement, and JRE's plans to produce a show about Rivera's life, it is reasonable to infer the Producers intended to commercialize Rivera's story before, and thus to the detriment of, JRE. (See *Imperial Ice*, *supra*, 18 Cal.2d. at p. 37 ["[a] party may not . . . under the guise of competition actively and affirmatively induce the breach of a competitor's contract in order to secure an economic advantage over that competitor"]; Prosser & Keeton, Torts (5th ed. 1984) § 129, p. 990 ["it is not enough that the defendant has done no more than enter into [a contract] with knowledge of the other, although he may be liable if he has taken an active part in holding forth an incentive, such as the offer of a better price or better terms," fn. omitted].)

30

Moreover, a defendant is not immune from liability for intentional inference with contract merely because the defendant exercised rights under another contract. (*Webber v. Inland Empire Investments, Inc.* (1999) 74 Cal.App.4th 884, 902 (*Webber*).)[14] In *Webber*, a junior lienholder sued the senior lienholder for intentionally interfering with the junior lienholder's note by foreclosing on the senior note and eliminating the junior lien. (*Id.* at pp. 893-894.) The court held the senior lienholder undoubtedly had the right to collect on the note, but that right "did not extend to intentional acts designed to disrupt the contractual relationship embodied in the junior lien." (*Id.* at

---

[14] Whether the Producers can justify their interference with the nondisclosure agreement by characterizing their conduct as mere performance of contractual obligations presents the affirmative defense of justification. (See *Quelimane Co. v. Stewart Title Guaranty Co.* (1998) 19 Cal.4th 26, 42 ["[j]ustification . . . is a defense to be raised at trial or on motion for summary judgment"]; *Saunders v. Superior Court* (1994) 27 Cal.App.4th 832, 844.) The Producers, however, did not raise that defense in the trial court, and the defense requires the trier of fact to balance a variety of factors. (See *Bert G. Gianelli Distributing Co. v. Beck & Co.* (1985) 172 Cal.App.3d 1020, 1054-1055, disapproved on another ground in *Dore v. Arnold Worldwide, Inc.* (2006) 39 Cal.4th 384, 394, fn. 2; *Lewin v. St. Joseph Hospital of Orange* (1978) 82 Cal.App.3d 368, 394.) To the extent the Producers are attempting to argue for the first time on appeal that compliance with prior contractual obligations justified their alleged interference with the nondisclosure agreement, we do not consider the argument. (See *Bikkina v. Mahadevan* (2015) 241 Cal.App.4th 70, 92; *Fort Bragg Unified School Dist. v. Colonial American Casualty & Surety Co.* (2011) 194 Cal.App.4th 891, 907.)

31

p. 902.)  In light of evidence showing the senior lienholder's foreclosure was "a sham . . . designed for the specific purpose of eliminating the junior lien," the court affirmed judgment in favor of the junior lienholder.  (*Ibid*.; see *whiteCryption Corporation v. Arxan Technologies, Inc.* (N.D.Cal. June 15, 2016, No. 15-CV-00754-WHO) 2016 WL 3275944, at p. 5 [denying a motion to dismiss a claim for intentional interference with contractual relations where the plaintiff's allegations went "further than simply conveying [the defendant's] desire to enforce the terms of [an] Agreement" by alleging the defendant induced a breach of contract "to gain a competitive advantage" and "to gain access to the confidential information"]; *Ariba, Inc. v. Rearden Commerce, Inc.* (N.D.Cal. Sept. 8, 2011, No. C-11-01619 EDL) 2011 WL 4031140, at p. 7 [conduct incidental to an assertion of contractual rights may constitute intentional interference with contractual relations where the "conduct was intentionally aimed at a perceived competitor"].)  JRE alleged and provided sufficient evidence to show at least a reasonable inference that the Producers intended "to further their own economic advantage at [JRE's] expense" by inducing Salgado, through payments and other benefits, to continue breaching the nondisclosure agreement.  (*Imperial Ice*, *supra*, 18 Cal.2d. at p. 39; see *I-CA Enterprises, Inc. v. Palram Americas, Inc.*, *supra*, 235 Cal.App.4th at pp. 290-292 [evidence supported an inference the defendant engaged in intentional acts designed to disrupt the relationship between the plaintiff and a third party rather than merely engaging in lawful competition].)

The Producers also argue they could not have intended to interfere with or induce a breach of the nondisclosure agreement because they reasonably relied on Salgado's representations that

he never signed the agreement and that no contract restricted his involvement in the Series. The Producers cite *1-800 Contacts, Inc. v. Steinberg* (2003) 107 Cal.App.4th 568 for the proposition that a plaintiff cannot establish a probability of prevailing on a cause of action for inducing breach of contract where the defendant "reasonably relied" on assurances the defendant's conduct would not infringe on a third party's contractual rights. But JRE promptly contested the reasonableness of the Producers' reliance on Salgado's representations and provided evidence from which a trier of fact could reasonably infer the Producers, at best, willfully ignored Salgado's contractual obligations. In contrast, the defendant in *1-800 Contacts* had no reason to question the reassurances it received that its conduct would not interfere with the contract. (See *id.* at p. 586.)

### 4. *Actual Breach or Disruption of the Contract*

The Producers do not argue JRE failed to present evidence of a breach or interference with the nondisclosure agreement. Indeed, the trial court's ruling on the Producers' special motion to strike stated the Producers "appear to concede that, if they knew of the NDA [when they signed the Coproducers Agreement] they could potentially face liability for the causes of action at issue." On appeal the Producers do not contest the trial court's characterization of their position or argue JRE failed to present evidence Salgado breached the nondisclosure agreement after the Producers had knowledge of it.

Moreover, as the trial court found, Salgado undoubtedly made additional disclosures of the same information to others during the production of the Series, and Salgado undoubtedly "used" protected information without JRE's authorization. Given

the breadth of the nondisclosure agreement's restrictions on Salgado's use and disclosure of protected information, it is a reasonable inference from the admissible evidence that Salgado breached the agreement after the Producers had knowledge of it.

### 5. *Resulting Damage*
#### a. *Causation*

"Determining whether a defendant's misconduct was the cause in fact of a plaintiff's injury involves essentially the same inquiry in both contract and tort cases. [Citations.] 'The test for causation in a breach of contract . . . action is whether the breach was a substantial factor in causing the damages.' [Citation.] Similarly, in tort cases, 'California has definitively adopted the substantial factor test . . . for cause-in-fact determinations. [Citation.] Under that standard, a cause in fact is something that is a substantial factor in bringing about the injury.'" (*Tribeca Companies, LLC v. First American Title Ins. Co.* (2015) 239 Cal.App.4th 1088, 1103; see *Rutherford v. Owens–Illinois, Inc.* (1997) 16 Cal.4th 953, 968-969; *Franklin v. Dynamic Details, Inc.* (2004) 116 Cal.App.4th 375, 391 [applying the substantial factor test to causes of action for interference with contractual relations and interference with prospective economic relations].) "The term 'substantial factor' has not been judicially defined with specificity, and indeed it has been observed that it is 'neither possible nor desirable to reduce it to any lower terms.' . . . [A] force which plays only an 'infinitesimal' or 'theoretical' part in bringing about injury, damage, or loss is not a substantial factor. [Citation.] Undue emphasis should not be placed on the term 'substantial.'" (*Rutherford v. Owens–Illinois, Inc.*, at p. 969.)

Further, a substantial factor need not be the only factor contributing to the plaintiff's alleged harm. (*Ibid*.)

The substantial factor test originated in the Restatement (Second) of Torts (*Potter v. Firestone Tire & Rubber Co.* (1993) 6 Cal.4th 965, 1025), which provides that an actor's conduct "is not a substantial factor in bringing about harm to another if the harm would have been sustained" in the absence of the actor's conduct. (Rest.2d Torts, § 432(1).) In the context of a cause of action for inducing interference with contractual relations, some courts have stated that causation exists where the plaintiff can show the contract would have been performed in the absence of the defendant's alleged inducements. (See *Hahn v. Diaz-Barba* (2011) 194 Cal.App.4th 1177, 1196; *Dryden*, *supra*, 65 Cal.App.3d at p. 997; see also 5 Witkin, Summary of Cal. Law (11th ed. 2018) Torts, § 850, p. 1156 ["[i]t must be alleged and proved that the defendant's act caused the breach, i.e., that otherwise the contract would have been performed"].) Causation is ordinarily a question of fact that may be decided as a question of law where the undisputed facts permit only one reasonable conclusion. (*Slovensky v. Friedman* (2006) 142 Cal.App.4th 1518, 1528; see *Ortega v. Kmart Corp.* (2001) 26 Cal.4th 1200, 1205 [causation is a question of fact].)

JRE contends the Producers caused Salgado to breach the nondisclosure agreement by providing him "financial enticements . . . on an ongoing basis throughout the production of the Series" and various "professional benefit[s], including executive producer credit and promotional opportunities, all of which helped Salgado market his forthcoming book about Rivera and bolstered Salgado's standing in the entertainment industry. The evidence in the record suggests the Producers agreed to

35

many of these "enticements" before they knew about the nondisclosure agreement. But once they knew of the agreement, the Producers' continued payments to Salgado were a substantial factor in bringing about Salgado's continued breaches. To determine whether JRE made the minimal showing of causation sufficient to establish a prima facie case, we need only ask whether Salgado would have continued to cooperate with the production and marketing of the Series had he not continued to receive payments and assurances of a platform from which to publicize and exploit confidential information about Rivera. The most reasonable inference from the evidence is that he would not. And, as stated, while the Producers' continued performance of their contractual obligations to Salgado may have been legally justified under the circumstances, the Producers did not assert this affirmative defense.

The Producers argue JRE cannot show their actions were a substantial factor in bringing about Salgado's alleged breaches because Salgado allegedly breached the agreement by writing an unpublished manuscript about his experiences with Rivera, would have breached the agreement anyway, and repudiated the agreement before the Producers allegedly induced him to breach it. For the most part, these arguments fail because they do not take account of the continuing nature of Salgado's obligations under the nondisclosure agreement and his repeated breaches of the agreement.

The Producers suggest Salgado had already breached the nondisclosure agreement before they began production of the Series by drafting an unpublished manuscript of a book about his experiences with Rivera. Merely drafting the manuscript without sharing it with anyone, while possibly a breach of Salgado's

36

obligation not to "use" protected information, would not result in any damages to JRE. It is a fair inference from the evidence, however, that Salgado breached the agreement for the first time no later than May 2016, when BTF and Univision signed the term sheet, which required BTF to deliver a copy of Salgado's manuscript to Univision "[p]romptly following the full execution of this Agreement."[15] But Salgado's unauthorized disclosure of the manuscript containing confidential information about Rivera did not render future disclosures of different information or to different audiences not actionable or immune from liability, either as a breach of contract or as the basis for interference with contract. (See *Bakst v. Community Memorial Health System, Inc.*, *supra*, 2011 WL 13214315, at p. 10 [applying California law and holding the defendant's obligation under a nondisparagement clause in a settlement agreement did not end with the "first alleged breach" because the "duty was a continuing one"]; see also *Martin Marietta Materials, Inc. v. Vulcan Materials Co.* (Del.Ch. 2012) 56 A.3d 1072, 1142 ["nothing in the [nondisclosure agreement] suggests that once [the plaintiff] disclosed one thing, the floodgates could open and all of [the defendant's] confidential information could come pouring out"]; cf. *Hebrew Academy of San Francisco v. Goldman* (2007) 42 Cal.4th 883, 891 ["a new cause of action for defamation arises each time

---

[15] It is also a reasonable inference from the evidence that Salgado breached the nondisclosure agreement by disclosing his manuscript to a publisher. Contrary to the Producers' assertions, however, it appears the manuscript was not actually published before Univision began broadcasting the Series. Urdaneta conceded that in December 2016 consumers could only preorder the book.

37

the defamer 'repeats or recirculates his or her original remarks to a new audience'"]; *Wells v. Talk Radio Network-FM, Inc.* (N.D.Ill., Aug. 7, 2008, No. 07 C 4314) 2008 WL 4888992, at p. 3 ["each subsequent rebroadcast [of plaintiff's voice] was an attempt to reach a new audience and, therefore, retriggered" a new cause of action for misappropriation].)

As the trial court recognized, a "disclosure of one piece of protected information does not mean that there is no breach when another item is disclosed; a disclosure to a small number of individuals does not mean that there is no breach when the same information is published to others through a widely available book or television program." The Producers' argument explains why this is so: "Given that Salgado had already authored the manuscript *and was looking for a production partner* at the time that he approached [the Producers], [the Producers] could not be and are not the 'but for' cause of his breach." But Salgado did not disclose his manuscript to millions of television viewers. At most, by the time the Producers learned of the nondisclosure agreement, Salgado had disclosed the manuscript and its contents to potential publishers, the Producers, Univision, and perhaps other potential partners. The Producers accepted Salgado's invitation to become his "production partner," thereby enabling Salgado to disclose at least the confidential information in his manuscript to a much larger audience than his unpublished manuscript had. Taking the Producers' argument to its logical end would preclude JRE from recovering from Salgado (not to mention the Producers) for damages caused by Salgado's far more damaging disclosures. For the same reason, that Salgado may have breached the nondisclosure agreement in the future by publishing his manuscript does not mean the

Producers' actions were not a substantial factor in bringing about the disclosure of Rivera's secrets to a national broadcast audience.

Finally, the Producers argue Salgado never intended to honor his obligations under the nondisclosure agreement and disavowed those obligations by (1) representing and warranting he was not bound by any contract that would impair his involvement in the Series, (2) signing a notarized affidavit to that effect, and (3) continuing to deny he ever signed the nondisclosure agreement. The Producers' arguments do not establish, as a matter of law, their actions were not a substantial factor in bringing about Salgado's alleged breach of the nondisclosure agreement by disclosing and using confidential information for the purpose of producing, marketing, and broadcasting a "tell-all" story about Rivera. While Salgado may have found other partners to facilitate his alleged breaches of contract had the Producers not been involved, JRE made a showing of minimal merit on the element of causation.

### b.  *Damages*

As discussed, JRE alleged the Producers' interference with Salgado's nondisclosure agreement negatively affected the value of the information protected by the agreement and the ability of JRE to use the information for its purposes. JRE further alleged the Producers' interference limited JRE's economic opportunities to publish a book or produce or sell a television show or series about Rivera containing the information. The Producers did not argue in their special motion to strike that JRE could not make a prima facie factual showing of its damages. The trial court did not address this element in its ruling, and the Producers do not

39

argue on appeal that JRE did not make a sufficient prima facie showing on damages.

C.    *The First Amendment Bars JRE's Causes of Action Against Univision*

Unlike the Producers, Univision argued in the trial court the First Amendment barred JRE's causes of action because the Series was "a truthful account of a newsworthy event about a public figure." The trial court disagreed, concluding JRE met its burden to show at this stage of the proceedings Univision's actions constituted an "independent tort" that was not protected under the First Amendment as "routine reporting techniques." (*Nicholson v. McClatchy Newspapers* (1986) 177 Cal.App.3d 509 (*Nicholson*).) Univision contends the trial court improperly applied *Nicholson* to the facts of this case and accepted the truth of JRE's allegations without requiring JRE to present admissible evidence to support them.

1.    *The Scope of First Amendment Protection for Newsgathering Techniques Used To Acquire Truthful, Newsworthy Information*

"'[S]peech on public issues occupies the highest rung of the hierarchy of First Amendment values, and is entitled to special protection.'" (*Snyder v. Phelps* (2011) 562 U.S. 443, 452 (*Snyder*); see *Connick v. Myers* (1983) 461 U.S. 138, 145.) "Speech deals with matters of public concern when it can 'be fairly considered as relating to any matter of political, social, or other concern to the community,' [citation] or when it 'is a subject of legitimate news interest; that is, a subject of general interest and of value and concern to the public.'" (*Snyder*, at p. 453.) "'[C]elebrity

40

gossip'" concerning "high profile individuals" constitutes a matter of public concern (*Jackson v. Mayweather* (2017) 10 Cal.App.5th 1240, 1254), and JRE does not contend otherwise.

"The right to speak and publish," however, "does not carry with it the unrestrained right to gather information." (*Zemel v. Rusk* (1965) 381 U.S. 1, 17; see *Lieberman v. KCOP Television, Inc.* (2003) 110 Cal.App.4th 156, 165.) In *Branzburg v. Hayes* (1972) 408 U.S. 665 the United States Supreme Court held the "First Amendment does not guarantee the press a constitutional right of special access to information not available to the public generally." (*Id.* at p. 683.) The press has no "'special immunity from the application of general laws,'" nor does it have a "'special privilege to invade the rights and liberties of others.'" (*Ibid.*)

In *Cohen v. Cowles Media Co.* (1991) 501 U.S. 663 (*Cohen*) the United States Supreme Court held the First Amendment did not prohibit a plaintiff from recovering damages against a newspaper for breaching its promise not to publish the plaintiff's identity as the source of a particular story. The United States Supreme Court stated that "generally applicable laws do not offend the First Amendment simply because their enforcement against the press has incidental effects on its ability to gather and report the news." (*Id.* at p. 669; see *Shulman v. Group W Productions, Inc.* (1998) 18 Cal.4th 200, 236 (*Shulman*) ["the First Amendment does not immunize the press from liability for torts or crimes committed in an effort to gather news"]; *Nicholson, supra,* 177 Cal.App.3d at p. 518 [same].) The First Amendment does not "shield the press from torts and crimes committed in the pursuit of a story." (*Wolfson v. Lewis* (E.D. Pa. 1996) 924 F.Supp. 1413, 1417; see *Raef v. Appellate Division of Superior Court* (2015) 240 Cal.App.4th 1112, 1123; *Dahlstrom v.*

41

*Sun-Times Media, LLC* (7th Cir. 2015) 777 F.3d 937, 950; *Dietemann v. Time, Inc.* (9th Cir. 1971) 449 F.2d 245, 249.)

"While refusing to recognize a broad privilege in newsgathering against application of generally applicable laws, the United States Supreme Court has also observed that 'without some protection for seeking out the news, freedom of the press could be eviscerated.'" (*Shulman*, *supra*, 18 Cal.4th at p. 236, quoting *Branzburg v. Hayes*, *supra*, 408 U.S. at p. 681.) The United States Supreme Court has consistently limited the press's newsgathering privilege, however, to circumstances in which the press "lawfully obtains truthful information about a matter of public significance." (*Smith v. Daily Mail Pub. Co.* (1979) 443 U.S. 97, 103; accord, *The Florida Star v. B.J.F.* (1989) 491 U.S. 524, 533 (*Florida Star*); see *Bartnicki v. Vopper* (2001) 532 U.S. 514, 525, 535 ["a stranger's illegal conduct does not suffice to remove the First Amendment shield from speech about a matter of public concern," so long as the press's "access to the information . . . was obtained lawfully"]; *Cohen*, *supra*, 501 U.S. at p. 671 ["it is not at all clear that [the defendants] obtained [the plaintiff's] name 'lawfully' in this case, at least for purposes of publishing it"].) By protecting newsgathering techniques that lawfully acquire information, "the government retains ample means of safeguarding significant interests upon which publication may impinge." (*Florida Star*, at p. 534.) For example, "[t]o the extent sensitive information rests in private hands, the government may under some circumstances forbid its nonconsensual acquisition, thereby bringing outside of the *Daily Mail* principle [that the government may not punish the publication of lawfully acquired information] the publication of any information so acquired." (*Florida Star*, at p. 534; see

*Shulman*, at pp. 242-243 [First Amendment did not bar a cause of action for invasion of privacy where a newspaper published recorded communications between accident victims and rescuers in a helicopter ambulance]; *Lieberman v. KCOP Television, Inc.*, *supra*, 110 Cal.App.4th at pp. 165-166 [trial court properly denied a special motion to strike a cause of action based on unlawfully recorded communications between a physician and his patients]; *KOVR-TV, Inc. v. Superior Court* (1995) 31 Cal.App.4th 1023, 1030-1032 [First Amendment did not bar a cause of action for intentional infliction of emotional distress where a television reporter told small children their neighbors had been killed and filmed their shocked reactions].)

In *Nicholson*, *supra*, 177 Cal.App.3d 509 the court held a judicial appointee who later ran for public office could not recover damages for invasion of privacy or violation of state law from newspapers that published his unfavorable judicial evaluation by the Commission on Judicial Nominees. (*Id.* at pp. 513-514.) California law made evaluations from that commission confidential, but "in some manner" the State Bar communicated the appointee's unfavorable rating to two newspapers. (*Ibid*.) The court in *Nicholson* stated: "The First Amendment . . . bars interference with th[e] traditional function of a free press in seeking out information by asking questions. Thus it is that 'a journalist is free to seek out sources of information not available to members of the general public, that he is entitled to some constitutional protection of the confidentiality of such sources and that government cannot restrain the publication of news emanating from such sources.' [Citation.] Consequently, the news gathering component of the freedom of the press—the right to seek out information—is privileged at least to the extent it

43

involves 'routine . . . reporting techniques.'" (*Id.* at p. 519, fn. omitted.)  The court in *Nicholson* included among such techniques "asking persons questions, including those with confidential or restricted information."  (*Ibid*.)  The court in *Nicholson* also identified "soliciting, inquiring, requesting and persuading" as "within the news gathering activities which are protected by the First Amendment."  (*Id.* at p. 520.)  "State law may not impinge upon [such activities] by characterizing [them] as tortious."  (*Ibid*.)  Thus, "[w]hile the government may desire to keep some proceedings confidential and may impose the duty upon participants to maintain confidentiality, it may not impose criminal or civil liability upon the press for obtaining and publishing newsworthy information through routine reporting techniques."  (*Id.* at pp. 519-520.)

2.      *There Was No Evidence Univision Unlawfully Acquired Confidential Information About Rivera*

Univision argues the First Amendment provides a complete defense to causes of action for interference with contract and inducing breach of contract when they arise out of the publication of "a truthful account of a newsworthy event about a public figure."  (*Nicholson*, *supra*, 177 Cal.App.3d at p. 516; see *Kapellas v. Kofman* (1969) 1 Cal.3d 20, 36 ["our courts have recognized a broad privilege cloaking the truthful publication of all newsworthy matters"].)  JRE argues "[p]aying money to intentionally encourage tortious interference with and to induc[e] the breach of a valid contract" is not "a routine reporting technique, or a traditional means of news-gathering."  Thus, JRE argues, Univision can be liable for committing "an independent

44

tort" by acquiring and using confidential information from Salgado. (See *Nicholson*, at p. 519 ["reporters are not privileged to commit crimes and independent torts in gathering the news"].)

Courts determine whether the media obtained information lawfully by considering whether the media obtained the information by "routine reporting techniques" or "traditional means of news-gathering." (See *Florida Star*, *supra*, 491 U.S. at pp. 538-539 [publication based on a government news release "is a paradigmatically 'routine newspaper reporting techniqu[e]'" that results in a "lawful" dissemination of information]; *Smith v. Daily Mail Pub. Co.*, *supra*, 443 U.S. at pp. 103-104 [use of "routine newspaper reporting techniques" leads to "lawfully obtained" information]; cf. *Nicholson*, 177 Cal.App.3d at pp. 512-513 [equating "illegal conduct by a reporter" with "impermissible reporting techniques"].) As the California Supreme Court explained in *Shulman*, *supra*, 18 Cal.4th at page 237: "At one extreme, "'routine . . . reporting techniques,'" such as asking questions of people with information ('including those with confidential or restricted information') could rarely, if ever, be deemed an actionable intrusion. [Citations.] At the other extreme, violation of well-established legal areas of physical or sensory privacy—trespass into a home or tapping a personal telephone line, for example—could rarely, if ever, be justified by a reporter's need to get the story. Such acts would be deemed highly offensive even if the information sought was of weighty public concern; they would also be outside any protection the Constitution provides to newsgathering." (See *Dietemann v. Time, Inc.*, *supra*, 449 F.2d at p. 249 [the "First Amendment is not a license to trespass, to steal, or to intrude by electronic means into the precincts of another's home or office"].)

California courts have not determined where intentionally interfering with a nondisclosure agreement falls on this continuum.[16]  Cases from other jurisdictions involving a First Amendment defense to claims against media for intentional interference with contract or economic relations have rejected those claims.  (See, e.g., *Seminole Tribe of Florida v. Times Pub. Co., Inc.* (Fla.Dist.Ct.App. 2001) 780 So.2d 310, 318 [under Florida law, a plaintiff tribe failed to show reporters had an improper motive to interfere with the tribe's relationship with its employees by using routine news gathering techniques to obtain and publish truthful but confidential information about the tribe's casino operations]; see also *Huggins v. Povitch* (N.Y.Sup.Ct., Apr. 19, 1996, No. 131164) 1996 WL 515498; *Dulgarian v. Stone* (1995) 420 Mass. 843, 852; but see *Falwell v. Penthouse Intern., Ltd.* (W.D.Va. 1981) 521 F.Supp. 1204, 1209 [suggesting in dicta that a publisher could be liable for inducing freelance writers "to violate the terms under which [an] interview

---

[16]  JRE cites numerous cases that it asserts have imposed liability for intentional interference with contract "even when the tort is committed in the service of producing expression ultimately protected by the First Amendment."  In none of those cases, however, did the defendants assert the First Amendment as a defense.  (See *Cussler v. Crusader Entertainment, LLC* (2012) 212 Cal.App.4th 356; *Woods v. Fox Broadcasting Sub., Inc.* (2005) 129 Cal.App.4th 344; *MDY Industries, LLC v. Blizzard Entertainment, Inc.* (9th Cir. 2010) 629 F.3d 928; *Brackett v. Hilton Hotels Corp.* (N.D.Cal. 2008) 619 F.Supp.2d 810.)

was granted"].)[17]  Some commentators have suggested the First Amendment protects the media from liability for intentionally inducing a breach of contract, at least where such interference leads to the publication of truthful information about a matter of public significance.  (See, e.g., Eugene Volokh, *Freedom of Speech and Intellectual Property: Some Thoughts After Eldred, 44 Liquormart, and Bartnicki* (2003) 40 Hous. L.Rev. 697, 739-743 [concluding a publisher could (but should not) be liable for tortious interference in newsgathering]; Sandra S. Baron et al., *Tortious Interference: The Limits of Common Law Liability for Newsgathering* (1996) 4 Wm. & Mary Bill Rts. J. 1027, 1045-1046, 1055; see also Prosser & Keeton, Torts (5th ed. 1984) § 129, pp. 988-989 [speech "addressed to social or political issues" may

---

[17]    Cases alleging intentional interference with contract or economic relations based on commercial disparagement or defamation require plaintiffs to show malice or injurious motive. (See, e.g., *Blatty v. New York Times Co.* (1986) 42 Cal.3d 1033, 1042-1043; *Morningstar, Inc. v. Superior Court* (1994) 23 Cal.App.4th 676, 696; *Brown & Williamson Tobacco Corp. v. Jacobson* (7th Cir. 1983) 713 F.2d 262, 273-274.)  JRE seeks damages based primarily on JRE's inability or decreased ability to monetize the information allegedly disclosed by Salgado, not on any reputational harms allegedly caused by the Series.  JRE also alleged, however, that the "defamatory nature" of the Series damaged "Jenni Rivera's brand and JRE's ability to market that brand as it would like in the future."  To the extent JRE seeks damages for disparagement or reputational harms, its claims are subject to the higher standard under *Blatty*.

receive "protection in the absence of some improper means, even though it interferes with contract," fn. omitted].)[18]

We need not decide the broad question whether the torts of inducing a breach of contract and interfering with a contract are "independent torts" such that the First Amendment can never provide a defense to such claims when they arise from conduct that leads to the publication or broadcast of truthful and newsworthy information. Here, it is uncontroverted Univision had no knowledge of the nondisclosure agreement at the time it entered into the license agreement with BTF. The evidence of Univision's actions, after it learned of the nondisclosure agreement, that arguably contributed to Salgado's continued breaches of the agreement consisted of continuing to pay license fees to BTF and promoting Salgado's involvement with the Series. Even if those actions were sufficient to serve as the basis of liability for tortious interference, they are not sufficiently "wrongful" or "unlawful" to overcome the First Amendment newsgathering and broadcast privileges. (See *Bartnicki v. Vopper*, *supra*, 532 U.S. at p. 535; *Nicholson*, *supra*, 177

_____

[18] Justice Mosk suggested in another context that the tort for inducing breach of contract could be "reformulated" to avoid any conflict with the First Amendment by requiring plaintiffs to demonstrate some element of independent wrongfulness, such as misrepresentation or physical coercion. (See *Della Penna v. Toyota Motor Sales, U.S.A., Inc.* (1995) 11 Cal.4th 376, 408, fn. 9 (conc. opn. of Mosk, J.).) This approach appears consistent with First Amendment jurisprudence requiring heightened scrutiny of generally applicable laws that target "'the expressive element of an expressive activity.'" (See *Raef v. Appellate Division of Superior Court*, *supra*, 240 Cal.App.4th at p. 1126.)

Cal.App.3d at p. 519.) Therefore, the First Amendment protected Univision's use and broadcast of the Series.[19]

## DISPOSITION

The order denying Univision's special motion to strike is reversed, and the matter is remanded with directions to enter a new order granting Univision's special motion to strike. The order denying the Producers' special motion to strike is affirmed. Univision is to recover its costs on appeal in case No. B284358, and JRE is to recover its costs on appeal in case No. B279739.

SEGAL, J.

We concur:

PERLUSS, P. J.

STONE, J.*

---

[19] Because we agree the First Amendment bars JRE's causes of action, we need not consider whether the UTSA also bars them.

* Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.

Filed 6/25/19

**CERTIFIED FOR PUBLICATION**

IN THE COURT OF APPEAL OF THE STATE OF CALIFORNIA

SECOND APPELLATE DISTRICT

DIVISION SEVEN

| | |
|---|---|
| JENNI RIVERA ENTERPRISES, LLC,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>LATIN WORLD ENTERTAINMENT HOLDINGS, INC. et al.,<br><br>Defendants and Appellants. | B279739<br><br>(Los Angeles County<br>Super. Ct. No. BC633764) |
| JENNI RIVERA ENTERPRISES, LLC,<br><br>Plaintiff and Respondent,<br><br>v.<br><br>UNIVISION COMMUNICATIONS INC. et al.,<br><br>Defendants and Appellants. | B284358<br><br>(Los Angeles County<br>Super. Ct. No. BC649519)<br><br><br>**ORDER CERTIFYING OPINION FOR PUBLICATION (NO CHANGE IN JUDGMENT)** |

THE COURT:

The opinion in this case filed May 29, 2019 was not certified for publication. Because the opinion meets the standards for publication specified in California Rules of Court,

rule 8.1105(c), the non-party's request for publication under California Rules of Court, rule 8.1120(a), is granted.

IT IS HEREBY CERTIFIED that the opinion meets the standards for publication specified in California Rules of Court, rule 8.1105(c); and

ORDERED that the words "Not to be Published in the Official Reports" appearing on page 1 of said opinion be deleted and the opinion be published in the Official Reports.

_____

PERLUSS, P.J.                    SEGAL, J.                    STONE, J. *

_____

*        Judge of the Los Angeles Superior Court, assigned by the Chief Justice pursuant to article VI, section 6 of the California Constitution.