Filed 10/21/22  Dunn v. Park III Condominium Homeowners Assn. CA4/1

# NOT TO BE PUBLISHED IN OFFICIAL REPORTS

**California Rules of Court, rule 8.1115(a), prohibits courts and parties from citing or relying on opinions not certified for publication or ordered published, except as specified by rule 8.1115(b).  This opinion has not been certified for publication or ordered published for purposes of rule 8.1115.**

## COURT OF APPEAL, FOURTH APPELLATE DISTRICT

## DIVISION ONE

## STATE OF CALIFORNIA

| | |
|---|---|
| GORDON DUNN et al., <br><br> Plaintiffs and Respondents, <br><br> v. <br><br> PARK III CONDOMINIUM HOMEOWNERS ASSOCIATION et al., <br><br> Defendants and Appellants. | D079026 <br><br><br> (Super. Ct. No. 37-2020-00027065-CU-CR-CTL) |

APPEALS from orders of the Superior Court of San Diego County, Joel R. Wohlfeil, Judge.  Affirmed.

Murphy, Pearson, Bradley & Feeney, Jeff C. Hsu and Patrick A. Gillespie for Defendants and Appellants Park III Condominium Homeowners Association, Alla Rabinovich, James Bradfield and Pernicano Realty & Management Inc.

Lewis Brisbois Bisgaard & Smith, Jeffry A. Miller and Daniel R. Velladao and Garth N. Ward for Defendant and Appellant Cheryl Snook.

No appearance for Plaintiffs and Respondents Gordon Dunn, Dylan Dunn and Valerie Good-Dunn.

On August 3, 2020, plaintiffs and respondents Gordon Dunn (Gordon), his wife, Valerie Good-Dunn, and their son, Dylan Dunn (together, the Dunns), sued defendants and appellants Park III Condominium Homeowners Association (HOA), Pernicano Realty & Management, Inc. (Pernicano), HOA board members Cheryl Snook, Alla Rabinovich and James Bradfield (board or directors), the Dunns' landlord at Park III Condominiums, Edmond Kuenster, and Pathmark Properties, Inc. (Pathmark), alleging 11 causes of action.

On August 20, 2020, the Dunns dismissed five causes of action with prejudice, leaving these remaining six: violation of the Fair Housing Act (FHA) (42 U.S.C. §§ 3604-3619) against the HOA, Snook, Rabinovich, Bradfield and Pernicano; violation of the Fair Employment and Housing Act (FEHA) (Gov. Code, §§ 12955, subs. (a) and (d), and 12955.8, subd. (a)) against all defendants; violation of the Unruh Civil Rights Act (Civil Code, § 51) against the HOA and Pernicano, tortious breach of warranty of habitability and retaliation against Pathmark and Kuenster, and negligence against all defendants.[1]

---

[1] The five dismissed causes of action are for defamation, breach of quiet enjoyment, private nuisance, intentional infliction of emotional distress, and failure to take steps necessary to prevent harassment and discrimination. The Dunns also concede in their opposition to the anti-SLAPP motion that defendant Snook, as an individual, is not subject to the Unruh Act.

After the anti-SLAPP proceedings, the Dunns filed a first amended complaint that alleges only four causes of action: violation of the FHA, FEHA, and the Unruh Act against the same parties as stated above. The negligence cause of action is pleaded against the HOA and Pernicano only. Because the Dunns have abandoned their claims for negligence against any of the individual defendants in their first amended complaint, the appeal is now moot as it pertains to those claims. The claims against Pathmark and Kuenster for tortious breach of the warranty of habitability and retaliation are not at issue in this appeal.

The first amended complaint is not in the record on appeal, but we requested and obtained a conformed copy of it from the parties.

Defendant Snook filed a special motion to strike the FHA, FEHA and negligence causes of action under Code of Civil Procedure[2] section 425.16 (anti-SLAPP motion). The other appellants (collectively Park III) separately filed an anti-SLAPP motion as to all causes of action.

The trial court denied Park III's motion in its entirety, and denied Snook's motion as to all causes of action except for the negligence claim.

Appellants do not challenge the court's ruling on the first prong of the anti-SLAPP statute that the Dunns' claims arose from protected activity. They contend as to the second prong that the Dunns have not shown a probability of prevailing on the merits of their claims. We affirm the orders.

FACTUAL AND PROCEDURAL BACKGROUND

We state the facts in the light most favorable to the Dunns, as the ones who opposed appellants' special motions to strike, accepting the Dunns' evidence as true. (*Sweetwater Union High School Dist. v. Gilbane Building Co.* (2019) 6 Cal.5th 931, 940 (*Sweetwater*).)

*The Dunns' Complaint*

The Dunns allege that all defendants were the agents, servants, employees and joint venturers of each of the other defendants, and at all times acted within the course and scope of that agency, employment and joint venture, and each defendant has knowingly accepted and ratified the acts and omissions of each of the other defendants.

---

2     Undesignated statutory references are to the Code of Civil Procedure. Section 425.16 is commonly referred to as the anti-SLAPP statute, since a special motion under the statute seeks to strike a " '[s]trategic lawsuit against public participation' " or SLAPP. (*Wilson v. Cable News Network, Inc.* (2019) 7 Cal.5th 871, 882, fn. 2 (*Wilson*).)

The Dunns allege Valerie and Dylan are of Hispanic national origin, but the complaint is silent about Gordon's national origin. The Dunns, who rent a unit at Park III Condominiums, allege that in 2017, Snook falsely accused Gordon of spray painting sexually graphic messages about her on Park III Condominium's walls.

The Dunns allege that Snook filed against them: a civil harassment complaint in 2017; a complaint of discrimination with the Department of Fair Employment and Housing (DFEH) in 2018 falsely claiming that Gordon had threatened her with violence due to her sex; and a civil harassment complaint in 2019.

The Dunns allege that in 2018, Snook informed them by letter that "they should be removed from the Park III community and it was her fiduciary duty to do so." They allege Snook sent to all Park III community residents three letters (collectively the letters). One made "derogatory statements about Hispanics and Blacks, to wit, that there was a need to limit people of color living in the Park III community."[3] The second letter targeted

---

[3]     Snook denied writing or distributing any of the letters. However, she describes all of them in her declaration supporting the anti-SLAPP motion. She describes the first letter as follows: "On or about April 29, 2019, a letter/flyer was widely distributed throughout the [Park III community], posted on various buildings, light posts, and signs in the community, including the public library. This letter included a photograph of myself and my partner, Steve Graham, taken from social media, and listed our home address and telephone number in the letter."

The letter states: "My name is Cheryl Snook and I am a resident in the park three condominiums as well as the Board President. I am a victim of vandalism and numerous threats. I am aware that this is done by people of color and I feel that we as a community we need to take a stance against this type of behavior. [¶] This behavior is acceptable in neighborhoods with large Hispanic and black ethnic groups however it is not acceptable here. We have a growing black and Hispanic population and we have noted an increase in serious crime including graffiti, attempted break-ins and vehicle damage. [¶]

4

African-American and Hispanic residents, stating that "African-American and Hispanic residents were responsible for serious crime in the area including but not limited to graffiti, attempted break-ins and vehicle damage."[4]  The third letter stated that "problems at the Park III community

We need to limit people of these ethnic groups from residing in our community as they are bringing crime and problems to our place of living as well as decreasing our property values.  My life partner Steve Graham and I are working hard to find a solution to this growing problem.  These ethnic groups need to stay in their communities, they do not belong in our area and I don't think this community should accept these people in our neighborhood.  [¶]  I am planning to hold a meeting in the UC library in the near future to brainstorm possible solutions.  If you are interested in contributing to this effort of cleaning up our community, please contact me with any suggestions."

[4]      Snook describes the second letter as follows:  "On or about July 5, 2019, another fraudulent letter/flyer was posted on the bulletin board in the laundry room in one of the [Park III community] buildings. . . .  [T]his letter included a photo of me taken off of social media, this time my Facebook page.  I had removed that picture from Facebook in 2016 when I was told that a Park Board member was seen using that photo on his phone as a screensaver.  That photo has not been available since 2016.  This letter again included my home address and telephone number."
        The letter states in relevant part:  "My name is Cheryl Snook.  I am as you all know the board president for The Park III [C]ondominiums . . . .  We have a large increase in crime in our area which I do know is linked to an increase in people of diverse culture and ethnic groups.  We have a large problem with derogatory graffiti in The Park [C]ondominiums as well as vandalism of property.  It has come to my attention that my team has two colored suspects in our complex committing these types of crimes.  My partner Steve Graham has been an enormous support for me as well as my fellow board members in this matter.  We have been keeping a detailed chronology of all recent incidents.  All of the incidents have been linked to specific people of color in our neighborhood.  I have even presented this information to some of our elected officials but have not really gotten a response yet.  [¶]  I do believe that this is a problem that is not just limited to the UC area; it's becoming widespread all over San Diego.  This has become a serious community problem for all of us affecting our quality of life and our property values.  Me and my fellow board members are currently struggling

were being caused by people of color," and that "the Dunns were being monitored." The Dunns allege the letters "falsely accused [Gordon] of attempting to break into [Snook's] residence at Christmas time in 2017."[5]

The Dunns allege that on July 31, 2020, Snook "randomly started taking photographs of [Gordon]. Later that same day, [she] placed a padlock on the garage . . . thereby preventing the Dunns access to their personal property." (Some capitalization omitted.)

---

trying to curb this derogatory behavior by discouraging people of diverse ethnicity to move here bringing their colored behavior to our society."

[5] Snook describes the third letter as follows: "On or about January 18, 2020, another fraudulent letter purportedly sent by me was mailed to multiple people throughout the [Park III community]. The envelope was similar to the other fraudulent letters and my signature was forged to the letter." Snook adds: "The letter is typewritten and includes a forged copy of my signature. I believe the signature may have been copied from another [HOA] document that I signed."

The letter states in relevant part: "My name is Cheryl Snook. [¶] As you all know I'm the board president of Park III and have been working very hard to create a nice community to live in. We have some problem residents lately that live in our neighborhood and we have determined that it's linked to that some [*sic*] are of colored ethnicity and in one case of foreign descent. We have experienced problems of vandalism including graffiti directed at me personally. We also had a board member's car vandalized twice by the same group of people. They are responsible for multiple other problems in our community including not following the rules we implemented. Me and my team, Jim Bradfield and Alla Rabinovich are working very hard having them all permanently removed from Park III condominiums."

The letter lists Gordon as someone the HOA is monitoring with cameras, and states he and another male attempted to break into Snook's condominium during Christmas in 2017, and that she had received "[m]ultiple threats of injury by both towards me and my partner Steve Graham." It also stated Gordon had "multiple restraining orders against him by [Snook] as well as other residents."

As to the FHA and FEHA causes of action, the Dunns allege Snook and the HOA members sent letters to the Park III community residents stating that people of color needed to leave the Park III community and were responsible for the graffiti, attempted break-ins and vehicle damage in the Park III Condominium community. They allege Park III "participated in the selective enforcement of Park III's Declaration of Covenants, Conditions and Restrictions [(CC&R's)] and the rules and regulations of the Park III community, specifically targeting the Dunns on the basis of their national origin/race." The Dunns allege appellants violated their rights to be free from discrimination under the Unruh Act, and they also allege negligence.

*The Anti-SLAPP Motions*

Snook and Park III filed separate anti-SLAPP motions directed to the six remaining causes of action. Snook argued in her motion that, as to the anti-SLAPP statute's first prong, the Dunns' complaint arose from her alleged statements and letters in furtherance of her right of petition or free speech in connection with a public issue under section 425.16, subdivision (e)(2), as the letters implicate investigation of criminal activity: "The Park community is a large community with 272 units. . . . Safety and criminal activity there are matters of public interest. All members have an interest in the safety of the community where they live and to be informed of ongoing criminal activity and matters reported to police. In fact, the ongoing criminal activity that is the subject of the letters was reported to the media." Snook stated her filing of the civil harassment complaint and the DFEH complaint was protected activity under section 425.16 subdivisions (b)(1), (c).

Snook argued as to the second prong of the anti-SLAPP statute that the Dunns could not prevail on any of their causes of action as she did not author, draft, disseminate or produce the letters and, in fact, she reported them to

7

police as forged and fraudulent documents. Further, she denied selectively enforcing the governing documents against the Dunns, and asserted the Dunns had failed to allege "any factual basis or evidence or any ulterior motive associated with any of the unspecified violation notices." Snook claimed the Dunns did not obtain a court order to sue her in her capacity as an HOA member as required by section 425.15, subdivision (a). She claimed immunity from liability in her capacity as a volunteer HOA director under the Federal Volunteer Protection Act. (42 U.S.C. § 14503(a)(3).) Snook additionally contended the business judgment rule barred the Dunns' lawsuit because an HOA director cannot be sued for decisions he or she makes in good faith in the best interests of the board. Snook also contended the Dunns could not prevail on their FHA or FEHA causes of action because she did not prevent them from selling, purchasing or renting property. She also contended the Dunns did not obtain right to sue letters before filing this lawsuit.[6]

Snook in her declaration outlined acts of vandalism to her real and personal property at the Park III Condominiums starting in 2015. She stated there was "an ongoing and persistent use of offensive and threatening graffiti directed against [her]." She asserted that several forged or fraudulent letters and flyers referencing her and her partner, Steve Graham, circulated in the condominium. Snook stated, "In April 2019, the concerted attack against me continued in the form of letters purportedly written by me which attributed racist beliefs to me as well as containing my forged signature. I categorically

---

[6] Appellants have not raised the matter of the right to sue letters on appeal. We regard the issue as forfeited for purposes of this appeal. (See *Oviedo v. Windsor Twelve Properties, LLC* (2012) 212 Cal.App.4th 97, 108, fn. 9 ["Issues as to which an appellant provides no argument or discussion are deemed waived and are properly disregarded."].)

deny composing, writing, sending, or posting any of these letters or flyers. I am shocked and horrified about the statements made in these letters, and they do not in any way reflect my beliefs."

Park III also argued in support of the anti-SLAPP motion that the HOA board's conduct in connection with the violation notices is protected activity under section 425.16, subdivision (e)(2): "Here, the [HOA] sent notices to [the Dunns'] landlord, for legitimate, non-discriminatory violations of the [HOA's] governing documents including maintaining multiple security cameras on their patio in violation of . . . the Rules as well as the CC&R's for altering or affixing devices to common areas; failing to use their garage for the specific purpose in violation of . . . the Rules; using a BBQ /smoker on the unit's patio causing smoke to enter a neighbor's unit in violation of . . . the rules and local fire code; and failure to maintain the exterior patio in manner compliant with . . . [the] Rules. . . . These policies and procedures are the same for all [HOA] members and demonstrate that the violation notices were not discriminatory, arbitrary, or capricious. Further the violation notices were not issued based on [the Dunns'] race." (Some capitalization omitted.)

Park III argued as to the second prong of the anti-SLAPP statute that the Dunns could not show a probability of prevailing on their causes of action. Park III contended based on the declarations of Snook, Rabinovich, and Bradfield that no defendant drafted or distributed any of the letters; and, in fact, they took "all action possible to investigate the letters and prevent further fraudulent letters from being distributed." (Some capitalization omitted.)

Michelle Steinbock, a Pernicano employee, affirmed in a declaration that the HOA did not enforce the CC&R's against the Dunns arbitrarily or

9

based upon race; rather, the following procedure was followed:  "When a violation of the [HOA] governing documents is discovered . . . a notice of violation is sent to the owner of the unit, informing them of the nature of the violation, and providing them with a hearing date wherein they can dispute or explain the basis for the violation notice.  The unit owner can also provide documents, or an explanation to the [HOA's]  board and manager in advance of the hearing.  Only after consideration of any explanation provided prior to or during the hearing does the Board vote as to whether to assess a fine to the unit owner for the violation."  Bradfield and Rabinovich assert the same in their declarations.

Park III contended the HOA directors at all times acted in good faith and within the scope of their duties; therefore, their decisions were shielded from liability under the business judgment rule (Corp. Code, § 7231, subd. (a)) and the judicial deference doctrine set forth in *Lamden v. La Jolla Shores Clubdominium Homeowners Assn.* (1999) 21 Cal.4th 249, 265.

The Dunns in opposition argued the first prong of the anti-SLAPP statute was not satisfied:  "No party in this litigation is a person or entity in the public eye, the conduct at issue does not directly affect a large number of people beyond the parties of this matter and there is no topic of widespread public interest.  The general public has no interest in a vendetta involving a[n] HOA, its President and tenants."

As to the second prong of the anti-SLAPP statute, the Dunns relied on five declarations they submitted for their contention they met their burden of showing a probability of prevailing on their FHA cause of action  They claimed they had shown they are members of a protected class (Hispanic) and they experienced a hostile housing environment based upon national origin,

10

"as evidenced by the racist letters at issue and [their] being subjected to selective enforcement of the Rules and Regulations of Park III by [] Pernicano and the [HOA directors]." (Some capitalization omitted.) The Dunns argued they also pleaded viable claims under the FEHA and the Unruh Act. They claimed the business judgment rule and the volunteer immunity doctrine were inapplicable.

The Dunns submitted declarations by Gordon, Catie Contreras, Autrey Porter, Derek Edwards and Michael Kirton.

In reply, appellants filed objections to the Dunns' evidence, and a request for judicial notice. The court made evidentiary rulings in its orders.

As to the first prong of the anti-SLAPP statute, the court ruled: "[T]he alleged defamatory letters were purportedly made in connection with an issue of public interest: governance of the entire [HOA] community comprised of 88 units. Specifically, the letters were allegedly transmitted within the context of an ongoing controversy regarding vandalism within the community. In addition, ongoing issues of vandalism and racism are important issues within the broader community surrounding the condominium units at issue in this litigation. This constitute[s] a matter of 'public interest' pursuant to section 425.16[, subdivisions] (e)(3) and (4). Defendant has met the burden of making a prima facie showing that the alleged conduct arises from protected activity."

In the Snook matter, the court denied the anti-SLAPP motion as to the FHA and FEHA causes of action, and granted it as to only the negligence cause of action. It pointed out that section 425.15, which applies to actions against directors and officers of nonprofit corporations, "expressly applies only to claims premised on 'any negligent act or omission.' In contrast, [the FHA and FEHA causes of action] are premised on intentional discriminatory

11

conduct. On the other hand, the failure to obtain court approval is fatal to [the Dunns' negligence cause of action]. Thus, [they are] unable to establish a probability of prevailing on the merits as to the tenth cause of action."

The court relied on a declaration by Derek Edwards, who stated that during his tenure as community manager for the Park III Condominiums community, Snook on three or four occasions distributed letters to the Park III Condominiums community. Snook "would place these letters on the vehicles of Park III residents as well as post the letters in the community laundry rooms."

The court also relied on a declaration from Kirton, a Park III Condominiums resident who stated he once saw Snook standing in front of his roommates' vehicles taking photographs. He asked her what she was doing, and she responded, "None of your business, I am gonna get you next, Nigger." (Some capitalization omitted.) Kirton responded by calling Snook a racist and yelling "black lives matter" about four times. The court reasoned: "These declarations are evidence that defendant Snook has a history of disseminating letters to residents within the development, and that she harbored racist beliefs such that it can be inferred that she drafted and disseminated the subject racist letters. Plaintiff Gordon Dunn's declaration is also signed under penalty of perjury, and is evidence that false violation notices were issued. This comprises evidence that [the Dunns] were unfairly targeted by the [HOA] board." (Some capitalization omitted.)

As to Park III, the court denied the anti-SLAPP motion as to the causes of action for violations of the FHA, the FEHA, and the Unruh Act, exempting the board members as to the Unruh Act claim. The court ruled regarding the negligence cause of action as to Park III that the complaint "sufficiently alleges that the subject letters were initiated and promulgated on behalf of

12

the [HOA], as well as selective enforcement of [HOA] rules and regulations." As to all defendants, the court ruled the Dunns had shown a probability of prevailing under the anti-SLAPP statute's second prong: "Given the evidence of Snook's racial animus, it can be reasonably inferred that Plaintiffs were targeted because of their nationality (Hispanic)." The court concluded "[t]his same evidence also supports a discriminatory intent underlying the selective enforcement of [HOA] rules and regulations, and purported false accusations of rule violations."

The court ruled the business judgment rule was inapplicable as to all defendants: "Board actions motivated by racial animus and that result in fabricated rule violations or selective enforcement of the rules do not constitute good faith efforts to further the purposes of the development, and are not consistent with the governing documents or public policy. Thus it is disputed whether the 'business judgment rule' applies to shield board members from liability."

## DISCUSSION

### I. *Anti-SLAPP Law and Standard of Review*

"[T]he anti-SLAPP statute is designed to protect defendants from meritless lawsuits that might chill the exercise of their rights to speak and petition on matters of public concern. [Citations.] To that end, the statute authorizes a special motion to strike a claim 'arising from any act of that person in furtherance of the person's right of petition or free speech under the United States Constitution or the California Constitution in connection with a public issue.' " (*Wilson, supra,* 7 Cal.5th at p. 884.)

"Litigation of an anti-SLAPP motion involves a two-step process. First, 'the moving defendant bears the burden of establishing that the challenged allegations or claims "aris[e] from" protected activity in which the defendant

13

has engaged.' [Citation.] Second, for each claim that does arise from protected activity, the plaintiff must show the claim has 'at least "minimal merit." ' [Citation.] If the plaintiff cannot make this showing, the court will strike the claim." (*Bonni v. St. Joseph Health System* (2021) 11 Cal.5th 995, 1008–1009.) "But the plaintiff's second-step burden is a limited one. The plaintiff need not prove her case to the court [citation]; the bar sits lower, at a demonstration of 'minimal merit' [citation]. At this stage, ' "[t]he court does not weigh evidence or resolve conflicting factual claims. Its inquiry is limited to whether the plaintiff has stated a legally sufficient claim and made a prima facie factual showing sufficient to sustain a favorable judgment. It accepts the plaintiff's evidence as true, and evaluates the defendant's showing only to determine if it defeats the plaintiff's claim as a matter of law." ' " (*Wilson, supra,* 7 Cal.5th at pp. 891–892.)

On appeal, we examine without deference an order granting or denying an anti-SLAPP motion to strike. We neither weigh credibility nor compare the weight of the evidence. (*Flatley v. Mauro* (2006) 39 Cal.4th 299, 325.) In doing so, we conduct " 'an independent review of the entire record.' " (*Roche v. Hyde* (2020) 51 Cal.App.5th 757, 787.) We exercise our discretion to examine all of the evidence the parties presented to determine if prima facie evidence supports the plaintiffs' contentions. (§ 425.16, subd. (b)(2).)

II. *Analysis*

A. *First Prong of the anti-SLAPP Statute*

The court concluded appellants met their burden under the first prong of the anti-SLAPP statute. Because respondents did not file a cross appeal challenging this conclusion or file a respondents' brief, we need not discuss this prong.

14

B. *Second Prong of the Anti-SLAPP Statute*

(i) *Applicable Law Regarding the FHA Claim*

It is unlawful to refuse to sell or rent a dwelling to any person because of that person's race or color (among other protected classes.)  (42 U.S.C. § 3604(a).)  It is also unlawful to discriminate against any person in the terms, conditions, or privileges of sale or rental of a dwelling because of race or color.  (*Id*., § 3604(b).)  "It shall be unlawful to coerce, intimidate, threaten, or interfere with any person in the exercise or enjoyment of, or on account of his having exercised or enjoyed, or on account of his having aided or encouraged any other person in the exercise or enjoyment of, any right granted or protected by section 3603, 3604, 3605, or 3606 of this title."  (42 U.S.C. § 3617.)

As relevant to the procedural posture of this case, an FHA claim can proceed under either a disparate-treatment or a disparate-impact theory of liability, and a plaintiff is not required to elect which theory the claim relies upon at pre-trial, trial, or appellate stages.  (*See Wright v. National Archives & Records Service* (4th Cir. 1979) 609 F.2d 702, 711.)  Under a disparate-treatment theory of liability, a "plaintiff must establish that the defendant had a discriminatory intent or motive," whereas "a plaintiff bringing a disparate-impact claim challenges practices that have a disproportionately adverse effect on minorities and are otherwise unjustified by a legitimate rationale."  (*Texas Dept. of Housing & Community Affairs v. Inclusive Communities Project, Inc.* (2015) 576 U.S. 519, 524.)  Under the disparate-impact theory, the plaintiff must also demonstrate a causal connection between the defendant's policy and the statistical disparity.  (*Ibid*.)

15

(ii) *Applicable Law Regarding the FEHA Claim*

Under the FEHA, it is unlawful for the owner of any housing accommodation to discriminate against or harass any person because of the race, color, or national origin (among other protected classes). (Gov. Code, § 12955, subd. (a).) It is unlawful for any owner of housing accommodations to harass, evict, or otherwise discriminate against any person in the rental of housing accommodations when the owner's dominant purpose is retaliation against a person who has opposed discriminatory or harassing practices made unlawful under Government Code section 12955. (*Id.*, § 12955, subd. (f).) It is unlawful for any person to aid, abet, incite, compel, or coerce the above referenced discrimination or harassment. (*Id.*, subd. (g).)

"Because of the similarity between state and federal employment discrimination laws, California courts look to pertinent federal precedent when applying our own statutes." (*Guz v. Bechtel Nat. Inc.* (2000) 24 Cal.4th 317, 354 (*Guz*).) In analyzing FEHA discrimination claims, including national origin discrimination, California courts have long used the three-stage burden-shifting test established by the United States Supreme Court in *McDonnell Douglas Corp. v. Green* (1973) 411 U.S. 792, 793; *Reid v. Google, Inc.* (2010) 50 Cal.4th 512, 520, fn. 2; *Guz*, at p. 354.)

"This so-called *McDonnell Douglas* test reflects the principle that direct evidence of intentional discrimination is rare, and that such claims must usually be proved circumstantially. Thus, by successive steps of increasingly narrow focus, the test allows discrimination to be inferred from facts that create a reasonable likelihood of bias and are not satisfactorily explained." (*Guz, supra,* 24 Cal.4th at p. 354.)

"At trial, the *McDonnell Douglas* test places on the plaintiff the initial burden to establish a prima facie case of discrimination. This step is

16

designed to eliminate at the outset the most patently meritless claims, as where the plaintiff is not a member of the protected class . . . While the plaintiff's prima facie burden is 'not onerous' [citation], he [or she] must at least show ' "actions taken by the [defendant] from which one can infer, if such actions remain unexplained, that it is more likely than not that such actions were 'based on a [prohibited] discriminatory criterion.' " ' " (*Guz, supra,* 24 Cal.4th at pp. 354–355.) "If, at trial, the plaintiff establishes a prima facie case, a [rebuttable] presumption of discrimination arises." (*Arnold v. Dignity Health* (2020) 53 Cal.App.5th 412, 423–424.) The burden then shifts to the defendant to show that its action was motivated by legitimate, nondiscriminatory reasons. (*Guz, supra,* at pp. 355–356.) A reason is " 'legitimate' " if it is "*facially unrelated to prohibited bias*, and which if true, would thus preclude a finding *of discrimination*." (*Id.* at p. 358.) If the defendant meets this burden, the plaintiff then must show that the defendant's reasons are pretexts for discrimination, or produce other evidence of intentional discrimination. (*Id.* at p. 356.)

(iii) *Applicable Law Regarding the Unruh Act*

The purpose of the Unruh Civil Rights Act is to "create and preserve 'a nondiscriminatory environment in California business establishments by "banishing" or "eradicating" arbitrary, invidious discrimination by such establishments.' " (White v. Square, Inc. (2019) 7 Cal.5th 1019, 1025, quoting Angelucci v. Century Supper Club (2007) 41 Cal.4th 160, 167; Civ. Code, § 51.) " 'The Act stands as a bulwark protecting each person's inherent right to "full and equal" access to "all business establishments." ' " (*White, supra*, at p. 1025.)

Civil Code section 51, subdivision (b), states: "All persons within the jurisdiction of this state are free and equal, and no matter what their sex,

race, color, religion, ancestry, national origin, disability, medical condition . . . are entitled to the full and equal accommodations, advantages, facilities, privileges, or services in all business establishments of every kind whatsoever." Civil Code section 52, subdivision (a), provides: "Whoever denies, aids or incites a denial, or makes any discrimination or distinction contrary to Section 51 . . . is liable for each and every offense for the actual damages, and any amount that may be determined by a jury."

(iv) *Applicable Law Regarding Negligence*

" ' "[N]egligence is conduct which falls below the standard established by law for the protection of others." ' " (*Burns v. Neiman Marcus Grp., Inc.* (2009) 173 Cal.App.4th 479, 487–488, as modified (May 20, 2009). " 'The threshold element of a cause of action for negligence is the existence of a duty to use due care toward an interest of another that enjoys legal protection against unintentional invasion." (*Ibid.*)

(v) *Plaintiffs' Evidence Showing Probability of Prevailing*

Kirton, an African-American male, declared under penalty of perjury that he once observed Snook standing in front of his roommates' vehicles and taking photographs. He politely asked her what she was doing, and she harshly responded, "None of your business, I am gonna get you next, Nigger."

Edwards stated in his declaration that he worked as community manager at Park III and Snook was "very involved in the day-to-day operations of the Park III community. [She] would monitor certain residents, was confrontational with certain residents, and would insist upon accompanying me on my property inspections of the Park III community. During the property inspections [she] would insist on enforcing violations of the Park III community rules and regulations for some residents but would not enforce relations of those same Park III rules and regulations as to other

18

residents. . . . [She] had a history of selectively enforcing the Park III rules and regulations." (Some capitalization omitted.)

Gordon in his declaration denied vandalizing any vehicles in the Park III community or spray painting any of the above-referenced graphic signs on the community's walls. He specified that in 2017, Snook filed a harassment temporary restraining order accusing him and another resident of an attempted break-in of her home. He stated, "I could not have engaged in any such conduct because I had been hospitalized [during the relevant dates] for a severe blood infection and was not physically able to leave my residence."

As the court ruled, taken together, these declarations provide admissible evidence from which a trier of fact may infer Snook harbored animus based on national origin, and support an inference she engaged in prohibited harassment and discrimination against the plaintiffs. At the second stage of an anti-SLAPP hearing, the court may consider "affidavits, declarations, and their equivalents if it is reasonably possible the proffered evidence set out in those statements will be admissible at trial." (*Sweetwater*, *supra,* 6 Cal.5th at p. 949.) This conclusion applies equally to Park III because, as stated, the Dunns allege that each defendant is an agent of the other. Moreover, the HOA board members state in their declarations that under the HOA's governing documents, the board members vote on whether to assess fines on unit owners for violating the governing documents. Therefore, the admissible evidence submitted provides an inference that Park III participated in selectively enforcing the governing rules against the Dunns.

(vi) *Appellants' Challenges to the Dunns' Evidence*

Snook contends the Dunns' evidence was inadequate because the letters were not authenticated, and the Dunns did not prove she wrote them.

Park III contends appellants' evidence shows they did not write or distribute the letters or selectively enforce governing documents against the Dunns. Park III points out each letter was reported to the San Diego Police Department, and appellants "sought the help of the San Diego City Council, the San Diego Mayor's [O]ffice and the United States Post Office to help ascertain the people responsible for the drafting or distribution of the letters." (Some capitalization omitted.) Park III concludes: "Quite frankly, if the [police department] and [post office] have not been able to identify the culprit responsible for the letters, there are no facts or evidence which that [*sic*] can be put forward by [the Dunns] to overcome the presumption that the [HOA] acted reasonably with respect to their investigation and efforts to prevent further incidents."

Although the issue of who wrote and distributed the letters will be central at trial, their authorship is not required to be proved at this stage of the litigation, and we are required to accept the truth of plaintiffs' evidence. It is appropriate for a trial court to decline to consider evidence submitted in response to an anti-SLAPP motion only where that evidence "cannot be admitted at trial, because it is categorically barred or undisputed factual circumstances show inadmissibility." (*Sweetwater, supra,* 6 Cal.5th at p. 949.) Neither condition applies here. We express no opinion regarding the admissibility of the declarations in a future proceeding or a different context. As the California Supreme Court has stated, "To strike a complaint for failure to meet evidentiary obstacles that may be overcome at trial would not serve the SLAPP Act's protective purposes. Ultimately, the SLAPP Act was "intended to end meritless SLAPP suits early without great cost to the target" [citation], *not* to abort potentially meritorious claims due to a lack of discovery." (*Ibid*.) Here, appellants' "argument runs ahead of itself and

20

accordingly fails. . . . evidence may be considered at the anti-SLAPP motion stage if it is reasonably possible the evidence set out in supporting affidavits, declarations or their equivalent will be admissible at trial." (*Id*. at pp. 946–947.)

Appellants also challenge the declarations the Dunns submitted, again claiming they fail to show Snook or Park III created and disseminated the letters or selectively enforced the rules against the Dunns. Appellants specifically challenge Kirton's declaration, arguing that under Evidence Code section 1101, it contains inadmissible character evidence. Snook argues that Kirton's declaration, "attempts to use one alleged incident of racial animus to demonstrate that she drafted the letters." Park III argues Kirton "attempts to rely upon other collateral incidents to prove Snook's alleged authorship of the letters."

Evidence Code section 1101, subdivision (b) states: "Nothing in this section prohibits the admission of evidence that a person committed a crime, civil wrong, or other act when relevant to prove some fact (such as motive, opportunity, intent, preparation, plan, knowledge, identity, absence of mistake or accident . . ." Under that statute, and in the FEHA context, California courts of appeal have allowed admission of so-called "me-too" evidence to show intent or motive for the purpose of casting doubt on a defendant's stated reason for an adverse action against the plaintiff. (*Pantoja v. Anton* (2011) 198 Cal.App.4th 87, 92 [defining "me-too" evidence as that tending to show a defendant's alleged discrimination in the form of harassing activity against individuals other than the plaintiff]; accord *Meeks v. Autozone, Inc.* (2018) 24 Cal.App.5th 855, 871 ["California courts have held so-called 'me-too' evidence, that is, evidence of gender bias against employees other than the plaintiff, may be admissible evidence in discrimination and

harassment cases"].)  We reiterate that for present purposes, we do not opine whether the challenged declarations would be admissible in a different context.  It is enough for us to conclude that in this anti-SLAPP context, the appellants' Evidence Code section 1101 challenges to the declarations do not defeat the Dunns' allegations as a matter of law.  (*Wilson, supra,* 7 Cal.5th at pp. 891–892.)

According to Park III, Gordon's declaration is self-serving, and the only admissible portion of it, which refers to Snook's civil harassment complaint against him, runs afoul of the litigation privilege in Civil Code section 47, subdivision (b).  Although the litigation privilege appears to bar allegations in the complaint that rely on the civil harassment complaints and the DFEH complaint, we will not direct that they be stricken because they might have evidentiary value for proving the rest of the Dunns' claims.  We express no opinion regarding whether in a future proceeding and context this evidence will be admissible or will survive a litigation privilege challenge.

To the extent appellants suggest the Dunns submitted the challenged declarations solely to determine the authorship of the letters, we reject that notion.  Rather, in support of the Dunns' claims of harassment and discrimination, the declarations allow inferences of racial animus and selective enforcement of the HOA rules and regulations.  We may consider inferences as well as direct evidence to determine whether there is prima facie evidence in support of a plaintiff's claim.  "[T]he proper inquiry in the context of an anti-SLAPP motion 'is whether the plaintiff proffers sufficient evidence for such an inference.' " (*Oasis West Realty, LLC v. Goldman* (2011) 51 Cal.4th 811, 822; followed in *Jenni Rivera Enterprises, LLC v. Latin World Entertainment Holdings, Inc.* (2019) 36 Cal.App.5th 766, 781.)  We conclude that, considered together, the declarations the Dunns submitted allow a trier

of fact to draw sufficient inferences to support their claims. (See *Issa v. Applegate* (2019) 31 Cal.App.5th 689, 702 ["[t]he 'burden of establishing a probability of prevailing is not high'"]; *Whitehall v. County of San Bernardino* (2017) 17 Cal.App.5th 352, 363, [same].) Indeed, " 'to satisfy due process, the burden placed on the plaintiff must be compatible with the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery.' " (*Hardin v. PDX, Inc.* (2014) 227 Cal.App.4th 159, 166; see *Integrated Healthcare Holdings, Inc. v. Fitzgibbons* (2006) 140 Cal.App.4th 515, 530 ["[w]e are inclined to allow the plaintiff in a [special motion to strike] a certain degree of leeway in establishing a probability of prevailing on its claims due to 'the early stage at which the motion is brought and heard [citation] and the limited opportunity to conduct discovery' "].)

Appellants rely on the defenses of the business judgment rule and the doctrine of "judicial deference" to argue their decisions were made in good faith and that a court should defer to the HOA directors' decisions. However, they premise their arguments on the claim the Dunns have not presented evidence to show appellants were responsible for writing or distributing the letters, or to overcome the presumption appellants acted reasonably. Specifically, Park III argues: "Again, if the [police department] and [post office] have not been able to identify the culprit responsible for the letters, there are no facts or evidence which that [*sic*] be put forward by the [Dunns] to overcome the presumption that the HOA acted reasonably with respect to their investigation and efforts to identify the culprit and prevent further incidents." (Some capitalization omitted.) Snook argues, "Here, the Dunns do not provide admissible evidence demonstrating Snook either drafted the racist letters or was motivated by race when enforcing the HOA's rules and

regulations. Thus, the court must defer to Snook's decision as an officer of the HOA to enforce the HOA's rules and regulations against the Dunns."

We need not analyze these claims in any detail because, plainly, as to all of appellants' defenses regarding director liability, the allegations of animus and willful misconduct here are incompatible with the good faith requirement for application of these defenses. We agree with the trial court's ruling on appellants' defenses: "Board actions motivated by racial animus and that result in fabricated rule violations or selective enforcement of the rules do not constitute good faith efforts to further the purposes of the development, and are not consistent with the governing documents or public policy." Moreover, based on the Dunns' evidentiary submissions, which we are required to accept as true for purposes of our review, appellants have not shown that application of these doctrines here would, as a matter of law, defeat the Dunns' claims. Rather, at most, they create factual disputes to be resolved by a trier of fact.

Appellants have not demonstrated, with reference to specific evidence and the elements of the FHA or FEHA causes of action, that they met their own burden under the *McDonnell Douglas* test, and that when the burden shifted back to the Dunns, they failed to provide evidence of intentional discrimination. "When an appellant fails to raise a point, or asserts it but fails to support it with reasoned argument and citations to authority, we treat the point as waived." (*Benach v. County of Los Angeles* (2007) 149 Cal.App.4th 836, 852.)

The logic of the above analysis applies equally to appellants' challenges to the Dunns' causes of action for violation of the Unruh Act and for negligence.

24

DISPOSITION

The anti-SLAPP orders issued pertaining to the four remaining causes of action pending against appellants at the time of the anti-SLAPP hearings are affirmed.

O'ROURKE, J.

WE CONCUR:

HALLER, Acting P. J.

BUCHANAN, J.